# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| JOHN DRUMMOND, | ) | CASE NO. 4:07CV1776 |
| | ) | |
| PETITIONER, | ) | JUDGE SARA LIOI |
| | ) | |
| vs. | ) | |
| | ) | |
| MARC HOUK, | ) | **MEMORANDUM OPINION** |
| | ) | |
| RESPONDENT. | ) | |
| | ) | |

Petitioner, John Drummond ("Drummond" or "Petitioner"), has filed an Amended Petition for Writ of Habeas Corpus ("Amended Petition") pursuant to 28 U.S.C. § 2254. (ECF No. 45.) He challenges his convictions by a Mahoning County jury and the sentence of death recommended by the jury and adopted by the judge. In addition to reviewing Drummond's petition, the Court has reviewed the Return of Writ[1] (ECF No. 49) filed by Respondent, Mark Houk ("Respondent"), Petitioner's Traverse[2] (ECF No. 57), Respondent's Sur-Reply (ECF No. 58), and Petitioner's Sur-Sur-Reply (ECF No. 59).

For the reasons set forth below, Drummond's Amended Petition for Writ of Habeas Corpus is **GRANTED IN PART**.

---

[1] Respondent styles this document as a "return" although the current rule refers to an "answer." *See* Rule 5 of Rules Governing § 2254 Cases. For ease of reference, whenever Doc. No. 49 is referred to herein, the Court will use Respondent's terminology.

[2] Petitioner also uses the older terminology styling what is a "reply" under Rule 5 as a "traverse." For ease of reference, whenever Doc. No. 57 is referred to herein, the Court will use Petitioner's terminology.

# I.      Factual Background

On April 3, 2003, Drummond was indicted by a Mahoning County grand jury, charging him with the following eight counts: (1) aggravated murder of Jiyen Dent Jr. with prior calculation and design; (2) aggravated murder of Jiyen Dent Jr., who was an individual under 13 years of age; (3) attempted murder of Jiyen Dent; (4) attempted murder of Latoya Butler; (5) attempt to cause bodily harm to Jiyen Dent through use of a deadly weapon; (6) attempt to cause bodily harm to Latoya Butler through use of a deadly weapon; (7) discharge of a firearm into an occupied structure; and (8) use of a firearm while under a disability. The two counts of aggravated murder each contained the following two death penalty specifications: (1) the aggravated murder was part of a course of conduct involving the killing or attempt to kill two or more persons; and (2) the aggravated murder that occurred involved the death of an individual under thirteen years of age. Ohio Rev. Code § 2929.04(A)(5) & (A)(9).  Each count included a firearm specification. (ECF No. 34, App. Vol. I, at 35-39.) The trial court severed count eight from the other counts and subsequently dismissed it.

A jury trial on the remaining counts began with jury selection on January 12, 2004. (ECF No. 35, Trial Tr., Vol. 2, at 101.) The presentation of evidence began on February 2, 2004. (*Id.*, Vol. 12, at 2392.) The facts as stated by the Ohio Supreme Court are as follows:

> The state presented several witnesses who testified at Drummond's trial that Drummond and Brett Schroeder were members of the Lincoln Knolls Crips gang and considered themselves "original gangsters," or "OGs." Schroeder died from gunshot wounds in May 1998 in a death ruled a homicide. The perpetrator was convicted and is serving time in prison.

> The Dent family, Jiyen Dent Sr., Latoya Butler, his girlfriend, and their son, Jiyen Dent Jr., had moved into a home at 74 Rutledge Drive in Youngstown around March 20, 1998. Dent did not know Drummond, Wayne Gilliam, or Schroeder.

2

In the early evening of the shooting, a few days after Dent moved in, ten to 20 people gathered for a party outside the home of Gail Miller on Duncan Avenue in Youngstown to drink and listen to music. Sometime that evening, Drummond and Gilliam arrived.

During the party, James "Cricket" Rozenblad overheard Drummond, Gilliam, and Andre Bryant talking about a "guy moving in in [their] neighborhood [who] could have had something to do with the death of Brett Schroeder." Yaraldean Thomas also saw Drummond and Gilliam whispering to one another and heard Drummond say "It's on" after they finished talking.

Drummond left the party and returned a short time later with an assault rifle. He and Gilliam then got into Gilliam's burgundy Chevrolet Monte Carlo and drove down Duncan Lane toward Rutledge Drive. Approximately five to 15 minutes later, 11 shots were fired from an assault rifle into the Dent home. Within a few seconds, a 9 mm round was fired into the Dent home, and five 9 mm rounds were fired into the home of Diane Patrick, the Dents' next-door neighbor, who lived at 76 Rutledge Drive.

At around 11:25 p.m. that evening, Dent was in the living room watching a movie, Butler was in the kitchen, and Jiyen was in a baby swing in the living room. While watching TV, Dent heard gunshots and saw "bullets start coming through the windows and the walls." He then picked up the baby and ran down the hallway towards the bathroom. Dent fell in the hallway and noticed that Jiyen had been shot in the head. After making sure that his girlfriend was safe, Dent called 911.

That same night, Rebecca Perez, who lived nearby on Rutledge Drive, heard two series of shots when taking her trash outside. She saw shots coming from the corner of Duncan Lane and Rutledge Drive and noticed "a shadow up the street." Shortly thereafter, Perez saw a maroon car pull out of the driveway next to 65 Rutledge Drive, where Drummond lived. The car then drove without any headlights on past the Perez home. Approximately half an hour to 45 minutes later, Perez noticed that the maroon car had returned to the driveway next to Drummond's home. At trial, Perez identified Gilliam's Monte Carlo as the car she had seen that night.

Leonard Schroeder, the brother of Brett Schroeder, who had been killed nearly five years before, lived near Rutledge Drive. On the evening of March 24, Leonard heard a series of gunshots. Shortly afterwards, Drummond and Gilliam arrived at Leonard's home in Gilliam's car. Leonard asked Drummond about the shots, and Drummond said that he "didn't know who it is. It was probably Cricket and Wany." Gilliam said only that "some fools are shooting over there."

3

Arriving police and paramedics found that Jiyen [Jr.] had been killed. Investigators secured the scene and began their investigation. Officer Kerry Wigley walked down Rutledge Drive, looking for shell casings, and noticed two men in the dark, leaning against a car parked in a driveway. Wigley intercepted the two men, asked for their identification, and identified them as Drummond and Gilliam.

*State v. Drummond*, 111 Ohio St. 3d 14, 15-16 (2006).

At the conclusion of the proceedings, the jury convicted Drummond on all counts and specifications. (ECF No. 34, App. Vol. 2, at 95-112.) The penalty phase of the trial began on February 19, 2004. (ECF No. 35, Trial Tr., Vol. 18, at 3723.) Drummond presented the testimony of five witnesses during the mitigation hearing: his mother, father, the mother of his twin children, a neighbor, and Dr. John Fabian, a clinical psychologist.. Additionally, Drummond made a brief, unsworn statement to the jury. Further facts will be set forth as necessary to resolve the claims raised in the Amended Petition.

## II.     Procedural History

### A.     Direct Appeal

Drummond filed a timely notice of appeal to the Ohio Supreme Court on April 8, 2004, challenging his convictions and sentence of death. (ECF No. 34, App. Vol. 3, at 5.) In a brief filed December 21, 2004, Drummond raised the following fourteen propositions of law:

1.     Appellant was denied a fair trial when the trial court abused its discretion and overruled his motion in limine to exclude any trial evidence relating to other crimes, wrongs, or acts of appellant contrary to the protections of the Fifth and Sixth Amendments to the United States Constitution.

2.     The trial court erred to the prejudice of appellant by prohibiting trial counsel from cross-examining appellee's witnesses relative to their credibility and veracity involving pending criminal charges.

3.  The trial court abused its discretion by overruling appellant's motions to dismiss the death penalty specifications and denied him a fair trial, contrary to the protections of the Fifth and Fourteenth Amendments to the United States Constitution.

4.  Appellant's right to the effective assistance of counsel was violated when trial counsel's performance was extremely deficient to appellant's prejudice, in violation of U.S. Constitution, Amendment VI and Ohio Constitution, Article I, Section 10.

5.  The trial court abused its discretion regarding contested evidence and witnesses during the trial, in violation of U.S. Constitution, Amendments V and VI and Ohio Constitution, Section 10.

6.  Appellant was denied due process and a fair trial in violation of the United States and Ohio Constitutions when the trial court:

    A.  Failed to record and preserve all sidebar conferences on substantial and significant evidentiary and legal issues.

    B.  Repeatedly permitted leading questions by Appellee on direct examination.

    C.  Repeatedly permitted hearsay testimony and evidence by Appellee's witnesses on direct examination.

7.  The jury view as permitted by the court violated Appellant's right to a fair trial and due process.

8.  A criminal defendant's due process right to a fair trial is violated when the prosecution engages in extensive, deliberate, misleading and prejudicial misconduct. U.S. Constitution, Amendment VI, XIV; Ohio Constitution, Article I, Section 14.

9.  It is prejudicial error for a trial court to sentence Defendant to the death penalty, when, based upon the law and the record of this case, the sentence of death herein is inappropriate and is disproportionate to the penalty imposed in similar cases, in violation of Defendant's rights as guaranteed to him by the Fifth, Eighth, and Fourteenth Amendments to the U.S. Constitution and Sections 5, 9, 10, and 16 of Article One of the Ohio Constitution.

10.  The proportionality review that this Court must conduct in the present capital case pursuant to Ohio Revised Code Section 2929.05 is fatally flawed and therefore the present death sentence must be vacated pursuant

to the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution, Sections 5 and 10, Article I of the Ohio Constitution and Ohio Revised Code 2929.05, in violation of Defendant's rights as guaranteed to him by the Fifth, Eighth, and Fourteenth Amendments to the U.S. Constitution and Sections 5, 9, 10, and 16 of Article One of the Ohio Constitution.

11.    It is error for a trial court to impose a death sentence when the death penalty law as currently applied in Ohio violates R.C. 2929.05(A) by requiring appellate courts and the Supreme Court, in conducting their R.C. 2929.04(A) review of "similar cases" for proportionality, to examine only those cases in which a death sentence was imposed and ignore those in which a sentence of life with parole eligibility after twenty-five full years or life with parole eligibility after thirty full years was imposed. The current method also violated the rights to a fair trial and due process, results in cruel and unusual punishment, and implicates others of Appellant's protected rights as well, all as set forth in the Fifth, Sixth, Eighth, Ninth and Fourteenth Amendments to the United States Constitution and in Sections 1, 2, 5, 9, 10, 16 and 20, Article I of the Ohio Constitution.

12.    R.C. 2903.01, 2929.02, 2929.021, 2929.022, 2929.023, 2929.03, 2929.04, and 2929.05 as read together and as applied in this case violate the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and Sections 2, 9, 10, and 16 of Article I of the Ohio Constitution.

13.    Ohio's death penalty law is unconstitutional[.] Ohio Revised Code Ann. & 2903.01, 2929.02, 2929.021, 2929.022, 2929.023, 2929.03, 2929.04, and 2929.05, do not meet the prescribed constitutional requirements and are unconstitutional on their face and as applied to Appellant. U.S. Const. Amends. V, VI, VIII, XIV, Ohio Const. Art. I, Sections 2, 9, 10, 16, further, Ohio's death penalty statute violates the United States' obligations under international law.

14.    The trial court denied Appellant due process under the Fourteenth Amendment due to the fact his conviction for aggravated murder with specifications was against the manifest weight of the evidence and the jury's verdict was inconsistent with the evidence and testimony presented at trial.

(ECF No. 34, App. Vol. 3, at 44-47.) On November 4, 2005, the Ohio Supreme Court *sua sponte*

asked the parties to file additional briefs addressing two specific issues:

6

1.      Was the appellant denied his Sixth Amendment right to a public trial when the trial court closed the courtroom to spectators on February 4 and February 5, 2004?

2.      What is the appropriate remedy should this Court find that the trial court erred in ordering the courtroom closed?

(ECF No. 34, App. Vol. 3, at 219.) Drummond filed his supplemental brief addressing these issues. (ECF No. 34, App. Vol. 3, at 235.) The Ohio Supreme Court affirmed the convictions and sentences, including the sentence of death, on October 18, 2006. *State v. Drummond*, 111 Ohio St. 3d 14 (2006).

**B.      Post-conviction Proceedings**

Drummond filed a petition for post-conviction relief on January 28, 2005. He asserted the following 21 grounds for relief:

1.      Drummond's convictions and sentence are void or voidable because he was denied effective assistance of counsel during his capital trial as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and *Strickland v. Washington*, 466 U.S. 688 (1984). Drummond's attorneys failed to use the ballistics and firearms reports of a key state's forensic witness to support the defense's case at trial.

2.      Drummond's convictions and sentence are void or voidable because he was denied effective assistance of counsel during his capital trial as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and *Strickland v. Washington*, 466 U.S. 668 (1984). Defense counsel failed to cross-examine Chappell on why he included a 30-06 bolt-action rifle as "a possible source weapon" in his report.

3.      Drummond's convictions and sentence are void and/or voidable because he was denied effective assistance of counsel during his capital trial as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and *Strickland v. Washington*, 466 U.S. 668 (1984). Counsel's failure to investigate and use Carlini's ballistics report was unreasonable and prejudicial. Their failure allowed the jury to believe that Drummond was responsible for the fatal shot.

4.      Drummond's convictions and sentence are void and/or voidable because he was denied effective assistance of counsel during his capital trial as

7

guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and *Strickland v. Washington*, 466 U.S. 668 (1984). Drummond's trial counsel failed to investigate Jiyen Dent Sr. and his gang affiliations. They also failed to use an audio expert to analyze the critical 9-1-1 tape.

5.     The death sentence imposed on Drummond is void or voidable because he did not receive effective assistance of counsel during the penalty phase of his capital trial. Defense counsel's failure to present available and relevant mitigating evidence from a qualified gang expert prejudiced Drummond.

6.     The death sentence imposed on Drummond is void or voidable because he did not receive effective assistance of counsel during the penalty phase of his capital trial. Defense counsel's failure to present available, relevant, and compelling mitigating evidence to the jury prejudiced Drummond.

7.     The death sentence imposed on John Drummond is void or voidable because he did not receive effective assistance of counsel during the penalty phase of his capital trial. Drummond's attorneys unreasonably delayed their mitigation investigation and failed to properly prepare their expert witness. As a result, jurors did not have relevant, compelling mitigating evidence to weigh and give effect.

8.     The death sentence imposed on John Drummond is void or voidable because he did not receive effective assistance of counsel during the penalty phase of his capital trial. Defense counsel's failure to present available, relevant, and compelling mitigating evidence to the jury prejudiced Drummond. At Drummond's trial, defense counsel failed to investigate, prepare, and present mitigating evidence regarding Drummond's character, history, and background – namely, the dysfunction in his family. This available evidence would have humanized John Drummond and provided the jurors with reasons to spare his life.

9.     At Drummond's trial, defense counsel failed to investigate, prepare, and present mitigating evidence regarding Drummond's character, history, and background. This available evidence would have humanized John Drummond and provided jurors with reasons to spare his life. Defense counsel failed to present personal firsthand accounts of the environment in which John Drummond lived.

10.    At Drummond's trial, defense counsel failed to investigate, prepare, and present mitigating evidence regarding the negative influences that abounded within Drummond's family. This evidence would have humanized John Drummond and would have provided his jurors with reasons to spare his life. Drummond was prejudiced by his counsel's

8

ineffectiveness. A sound mitigation theory cannot be developed unless counsel conducts a reasonable, competent investigation and carefully considers all available evidence. *See Powell v. Collins*, 328 F.3d 268 (6th Cir. 2003).

11.    At Drummond's trial, defense counsel failed to investigate, prepare, and present mitigating evidence regarding Drummond's character, history, and background. This kind of evidence includes his family background. The evidence available, but not investigated by counsel, would have shown the jury that Drummond's father was not a proper adult male role model.

12.    At Drummond's trial, defense counsel failed to investigate, prepare, and present mitigating evidence regarding Drummond's character, history, and background – namely the amputation of his leg when he was sixteen years old.

13.    At Drummond's trial, defense counsel failed to investigate, prepare, and present mitigating evidence regarding Drummond's character, history, and background. Counsel also failed to object to the prosecutor's improper mitigation-phase closing argument.

14.    Drummond's convictions and sentence are void or voidable because he did not receive his Sixth Amendment right to effective assistance of counsel at his capital trial. Defense counsel's failure to investigate left the defense unprepared to rebut the state's case.

15.    Drummond's convictions and sentence are void or voidable because he did not receive his Sixth Amendment right to effective assistance of counsel at his capital trial. At trial, the state called a neighbor, Wanda Greer, to testify against Drummond. Mrs. Greer's testimony recounted the party at Dean Thomas's house on the evening of the shootings. She said that she heard gunshots and that she saw Wayne Gilliam's car driving back and forth. (T.p. 2607, 2612, 2615) The state also elicited testimony from Mrs. Greer about gang activity in the neighborhood. (T.p. 2617, 2619-20)

16.    Drummond had Sixteenth and Fourteenth Amendment rights to a fair trial and due process. The trial judge had an obligation to enforce those rights. But the judge in Drummond's case entered the proceedings with preconceived notions that tainted Drummond's capital trial. The judge's bias violated Drummond's right to have a fair trial presided over by an impartial judge.

17.    The death penalty scheme does not work. Jurors neither understand the law nor apply it when deciding capital cases. In Drummond's case, members of his jury either misunderstood or completely disregarded the

9

trial court's instructions, resulting in a death sentence that is void or voidable. Drummond's case is an example of a capital trial system that is defective. Drummond's rights under the United States Constitution's Fifth, Sixth, Eighth, and Fourteenth Amendments were violated, and he was prejudiced.

18.     Drummond's Sixth, Eighth, and Fourteenth Amendment rights to a fair trial and reliable sentence were violated when members of his jury failed to follow the trial court's instructions of law. Under Ohio's death penalty scheme, the jury is instructed to weigh aggravating circumstances against mitigating factors.  R.C. 2929.04(B). The judge specifically instructed the jurors: "Only the aggravating circumstances may be considered and weighed against the mitigating factors in determining the penalty." (T.p. 3915) The judge then listed the two indicted statutory aggravating circumstances. (T.p. 3915-16) She went on to instruct the jury: "You may only consider the aggravating circumstances that were just described to you and which accompanied the aggravated murder." (T.p. 3916) The jury failed to follow these instructions, and Drummond was prejudiced.

19.     Drummond's constitutional right to due process was violated when he was not informed of, and thus not present for, a court proceeding at his capital trial. Drummond states in an affidavit that he did not waive his presence at any court hearings or trial proceedings. (Ex. 24) Yet, the court announced that "John Drummond waived his right to be present during the discussion of the exhibits." (T.p. 3545) If, as the record seems to reflect, Drummond's attorneys told the court that their client waived his presence, they did so without his knowledge and consent.

20.     The judgment and sentence against Drummond are void or voidable because the death penalty as administered by lethal injection in the state of Ohio violates his constitutional right to protection from cruel and unusual punishment and to due process of law. U.S. Const. amends. VIII, XIV; Ohio Const. art. I §§ 9, 10, 16; *Ohio Adult Parole Authority v. Woodard*, 523 U.S. 272 (1998) (five justices holding that the Due Process Clause protects the "life" interest at issue in capital cases.).

21.     Drummond's judgment and sentence are void or voidable because, assuming *arguendo* that none of the grounds for relief in his postconviction petition individually warrant the relief sought from this court, the cumulative effects of the errors and omissions presented in the petition's foregoing paragraphs have been prejudicial and have denied Drummond his rights secured by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, and Article I, Sections 1, 2, 5, 9, 10, 16, and 20 of the Ohio Constitution.

(ECF No. 34, App. Vol. 5, at 35-99.) On February 14, 2006, the trial court granted the State's motion for summary judgment. Drummond filed a timely notice of appeal with the Seventh District Court of Appeals. He raised the following four assignments of error:

1.   The trial court erred by dismissing Appellant's postconviction petition, where he presented sufficient operative facts and supporting exhibits to merit an evidentiary hearing and discovery.

2.   The trial court erred by failing to rule on Appellant's motion for voluntary recusal of the trial judge and then dismissing the postconviction petition without a hearing, thus tainting the postconviction process.

3.   Ohio's postconviction procedures neither afford an adequate corrective process nor comply with due process and equal protection under the Fourteenth Amendment.

4.   Considered together, the cumulative errors set forth in Appellant's substantive grounds for relief merit reversal and remand for a proper postconviction process.

(ECF No. 34, App. Vol. 8, at 41-42.) On December 20, 2006, the Ohio court of appeals affirmed the trial court's disposition of the post-conviction petition. *State v. Drummond*, No. 05 MA 197, 2006 WL 3849295 (Ohio Ct. App. Dec. 20, 2006). Thereafter, the Ohio Supreme Court declined to accept Drummond's appeal for review. *State v. Drummond*, 113 Ohio St. 3d 1512 (Table) (2007).

## C.   Application to Reopen Direct Appeal/ Supreme Court Practice Rule XI [3]

---

[3] Supreme Court Practice Rule XI states in pertinent part:

Section 6.  Application for reopening

(A) an appellant in a death penalty case involving an offense committed on or after January 1, 1995, may apply for reopening of the appeal from the judgment of conviction and sentence, based on a claim of ineffective assistance of appellate counsel in the Supreme Court.

Supreme Ct. Prac. R. XI(6).  Because capital defendants whose crimes were committed after January 1, 1995, appeal their conviction and sentence directly to the Ohio Supreme Court, rather than to an intermediate Ohio appellate court, this Rule was meant to provide such defendants a forum in which to assert ineffective assistance of appellate counsel.

Drummond filed a timely application to reopen his direct appeal ("application to reopen" or "*Murnahan* appeal") with the Ohio Supreme Court on January 16, 2007. He alleged that his appellate counsel had been ineffective for failing to raise the following four propositions of law, as alleged below:

1.   Appellant's Sixth Amendment right to effective assistance of counsel was violated when his defense attorneys failed to devote sufficient time to preparing for trial; failed to maintain the attorney-client relationship; failed to object to prosecutorial misconduct; failed to object when the trial court vouched for a state's witness with inappropriate humor; failed to object when the trial court demeaned the proceedings with inappropriate humor; failed to object to or move to strike speculative answers and a state witness's prejudicial answer regarding remorse; failed to prepare their penalty-phase expert witness; and failed to prepare and present relevant mitigating evidence. U.S. Const. amends. VI, VIII, XIV; Ohio Const. Art. I, §§ 10, 16.

2.   The trial court violated Appellant's Sixth and Fourteenth Amendment rights to a fair trial and due process when it admitted prejudicial photographs during the trial; demeaned the proceedings by using inappropriate humor during trial; improperly vouched for a state witness by using inappropriate humor; failed to grant defense counsel's objection to a prejudicial identification of an audience member; failed to grant defense counsel's objection to improper evidence of the defendant's alleged lack of remorse; and made rulings that prejudiced the defense. U.S. Const. amends. VI, XIV; Ohio Const. Art. I, §§ 10, 16.

3.   A capital defendant is denied substantive and procedural due process rights to a fair trial and a reliable sentence when the prosecutor commits acts of misconduct during the capital trial. U.S. Const. Amends. VI, VIII, XIV; Ohio Const. Art. I, §§ 9, 10, 16.

4.   The cumulative effect of the errors at trial renders a capital defendant's trial unfair and his sentence arbitrary and unreliable. U.S. Const. amends. VI, XIV; Ohio Const. Art. I, §§ 9, 16.

(ECF No. 34, App. Vol. 4, at 7-8.) The Ohio Supreme Court denied Drummond's application on April 18, 2007. *State v. Drummond*, 113 Ohio St. 3d 1463 (Table) (2007). With this decision, Drummond's state court appeals concluded.

### III.  Federal Habeas Corpus Proceeding

Drummond filed a notice of intent to file a habeas corpus petition on June 15, 2007. (ECF No. 1.) Although the Court initially appointed counsel to represent Drummond, appointed counsel filed a Motion to Withdraw as Attorney and Request for New Counsel on September 12, 2007. (ECF No. 13.) The Court initially denied the request but later reconsidered its decision, allowing Drummond fourteen (14) days to decide whether he wished to retain his current counsel or request that the Court appoint new counsel. (ECF No. 19.) Drummond indicated that he wished to be represented by new counsel. (ECF No. 23.) The Court granted Drummond's request and, on November 16, 2007, appointed Timothy C. Ivey of the Office of the Federal Public Defender ("FPD") and David L. Doughten to represent him. (ECF No. 28.)[4] New counsel sought and obtained permission to file an Amended Petition, which they subsequently filed on May 5, 2008. (ECF No. 45.)

Drummond also requested discovery, which the Court denied in part and granted in part. Specifically, the Court permitted Drummond to obtain a ballistics expert to examine the trajectory of the bullets that caused the murder. The Court also permitted habeas counsel to depose defense psychologist Dr. John Fabian and trial counsel James Gentile and Ron Yarwood. (ECF No. 42.) Additionally, the Court granted Drummond's motion to unseal state court records. (ECF No. 46.) Drummond also made three requests to expand the record pursuant to Habeas Rule 7, to include materials he had obtained during discovery. (ECF Nos. 53, 55, 56.) On October 16, 2008, in three non-document orders, the Court granted each request.

---

[4] Eventually, Alan C. Rossman from the FPD was substituted as co-counsel of record with Mr. Doughten. (ECF No. 48.)

Respondent filed his Return of Writ on July 7, 2008. (ECF No. 49.) After requesting and receiving permission for an extension of time, Drummond filed a Traverse on September 22, 2008. (ECF No. 57.) Respondent thereafter filed a Sur-Reply (ECF No. 58), to which Drummond filed a Sur-Sur-Reply (ECF No. 59).

In the Amended Petition, Drummond raises the following 13 grounds for relief:[5]

1.  The trial court violated Drummond's right to a public trial under the Sixth and Fourteenth Amendments when, without adequate grounds, the judge closed the courtroom, denying the public access to the trial. (Denial of Public Courtroom)

2.  Trial court error deprived Drummond of his rights to confront and cross-examine witnesses, to due process, and a fair trial under the Sixth and Fourteenth Amendments. (Confrontation Violation)

3.  Drummond's constitutional rights to due process and a fair trial were violated when the trial court permitted the introduction of highly prejudicial evidence relating to gangs and weapons unrelated to the charged crimes. (Trial Violated Due Process)

4.  The [Petitioner's] convictions and sentence of death are void or voidable as the trial court violated the [Petitioner's] rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution by failing to excuse jurors for cause who had indicated that they could not be fair and impartial and the improper dismissal of a juror for cause [who] said he could be fair and impartial. (Improper Juror Dismissal Rulings)

5.  The evidence used to support Drummond's convictions and sentence is insufficient under the Sixth and Fourteenth Amendments. (Actual Innocence - Sufficiency of Evidence)

6.  The trial court violates a capital defendant's rights to a fair trial and due process when, as in Drummond's case, the judge manifests the appearance of bias against the defendant, in violation of the Sixth and Fourteenth Amendments to the United States Constitution. (Manifested Judicial Bias)

7.  Trial counsel violated Drummond's Sixth Amendment right to effective assistance of counsel when they failed to reasonably investigate the case,

---

[5] Although the Amended Petition refers to each ground as a "claim" for relief, the Court has elected to use herein the statutory term of "ground." The parenthetical summaries of the grounds are taken from the Amended Petition.

use available evidence to present a defense, and advocate on their client's behalf. (Culpability Phase IAC [Ineffective Assistance of Counsel])

8.   Trial counsel violated Drummond's Sixth Amendment right to effective assistance of counsel at the penalty phase when they failed to make a timely and reasonable investigation of his character, history, and background. Counsel's mitigation presentation was deficient and deprived the jurors of evidence that was worthy of weight and effect. (Penalty Phase IAC [Ineffective Assistance of Counsel])

9.   Drummond was denied his right to effective assistance of counsel in his direct appeal to the Ohio Supreme Court, in violation of the Sixth and Fourteenth Amendments to the United States Constitution. (Ineffective Assistance of Counsel - Direct Appeal)

10.   The prosecutors committed acts of misconduct during the capital trial, violating Drummond's substantive and procedural due process rights to a fair trial and reliable sentence under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. (Misconduct of Prosecutor)

11.   The Ohio Supreme Court's arbitrary refusal to review life sentences imposed in similar cases as part of the statutorily mandated proportionality review denied Drummond due process of law guaranteed by the Fourteenth Amendment. (Proportionality)

12.   Petitioner Drummond's convictions and death sentence are invalid because the cumulative effect of the constitutional errors set forth in this Habeas Corpus Petition violated his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments. (Cumulative Error)

13.   [The] Ohio statutory scheme for the implementation of the death penalty is unconstitutional. (Constitutional Challenge)

(ECF No. 45, *passim*.)

Upon reviewing the parties' briefs, on January 26, 2010, the Court issued an Order to Show Cause (ECF No. 61) wherein the Court required Respondent to show cause why the Court should not hold an evidentiary hearing on Drummond's claim of ineffective assistance of counsel during the mitigation, or penalty, phase of the trial. Drummond asserted in the Amended Petition that trial counsel provided Dr. Fabian, the defense expert, with insufficient

time and records to present a constitutionally adequate representation during the penalty phase of his trial.

The depositions of Dr. Fabian and trial counsel Gentile and Yarwood presented competing pictures of the defense team's mitigation investigation and preparation. While both parties conceded that Dr. Fabian did not perform well during his mitigation testimony, Dr. Fabian faulted counsel for his failures. He maintained that counsel did not provide him with adequate time to prepare, did not obtain a gang expert despite his request for one, and failed to provide him with information regarding Drummond's half-brother, Michael Brooks.

Trial counsel disputed most of Dr. Fabian's allegations. First, counsel claimed that Dr. Fabian indicated he could testify about Drummond's involvement with gangs. Counsel also disputed that Dr. Fabian ever asked them for additional time to prepare for his testimony. Counsel also were unaware of any documents or information that Dr. Fabian believed he lacked, including information regarding Michael Brooks. The Court therefore issued the Order to Show Cause for Respondent to explain why an evidentiary hearing was not necessary to resolve these factual disputes.

When neither party articulated a reason why the Court should not hold a hearing, the Court set a hearing date for May 20, 2010. (ECF No. 66.) After habeas counsel requested and received two continuances, the Court re-set the evidentiary hearing for July 19 and 20, 2010. (ECF No. 75.) Thereafter, the parties filed a Joint Motion to Clarify Scope of Evidentiary Hearing. (ECF No. 83.) Habeas counsel argued that Drummond's family members should be permitted to testify to demonstrate the prejudice necessary to establish an ineffective assistance claim. Conversely, Respondent believed that the purpose of holding an evidentiary hearing was to resolve the factual disputes between Dr. Fabian and Petitioner's trial counsel, and the hearing

therefore should be limited to their testimony alone. The Court determined that it would allow the testimony of Drummond's family members, if only to obviate the need for it at some later date and to create a full record for appellate purposes. (ECF No. 85.) Thereafter, the Court held the evidentiary hearing. The pertinent testimony and outcome of this evidentiary hearing is discussed below under Section VI (H), which addresses Petitioner's Eighth Ground for Relief.

## IV.     Standard of Review

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which amended 28 U.S.C. § 2254, was signed into law on April 24, 1996. In *Lindh v. Murphy*, 521 U.S. 320, 336 (1997), the Supreme Court held that the provisions of AEDPA apply to habeas corpus petitions filed after that effective date. *See also Woodford v. Garceau*, 538 U.S. 202, 210 (2003); *Barker v. Yukins*, 199 F.3d 867, 871 (6th Cir. 1999) ("It is now well settled that AEDPA applies to all habeas petitions filed on or after its April 24, 1996 effective date."). Because Drummond's petition was filed on October 12, 2007, AEDPA governs this Court's consideration of his petition.

AEDPA was enacted "to reduce delays in the execution of state and federal criminal sentences, particularly in capital cases, and 'to further the principles of comity, finality, and federalism.'" *Woodford*, 538 U.S. at 206 (quoting *Williams v. Taylor*, 529 U.S. 420, 436 (2000)). The requirements of AEDPA "create an independent, high standard to be met before a federal court may issue a writ of habeas corpus to set aside state-court rulings." *Uttecht v. Brown*, 551 U.S.1, 10 (2007) (citations omitted). Section 2254(d) provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any

claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim --

> (1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). This legal standard establishes a multi-faceted analysis involving a consideration of both the state court's statement and/or application of federal law and its finding of facts.

With respect to Section 2254(d)(1), "clearly established federal law" refers to the holdings, as opposed to *dicta*, of the Supreme Court's decisions as of the time of the relevant state-court decision. *Williams*, 529 U.S. at 412; *Barnes v. Elo*, 231 F.3d 1025, 1028 (6th Cir. 2000). The "contrary to" and "unreasonable application" clauses of Section 2254(d)(1) are independent tests and must be analyzed separately. *Williams*, 529 U.S. at 412-13; *Hill v. Hofbauer*, 337 F.3d 706, 711 (6th Cir. 2003). A state court decision is "contrary to" federal law only "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 412-13.

Even if the state court identifies the "correct governing legal principle," a federal habeas court may still grant the petition if the state court makes an "unreasonable application" of "that principle to the facts of the particular state prisoner's case." *Williams*, 529 U.S. at 413. A state court decision also involves an unreasonable application if it unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply or

unreasonably refuses to extend that principle to a new context where it should apply. *Hill*, 337 F.3d at 711 (citing *Williams,* 529 U.S. at 407). As the Supreme Court has advised, "[t]he question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable--a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) (citing *Williams*, 529 U.S. at 410). The reasonableness of the application of a particular legal principle depends in part on the specificity of the relevant rule. *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004). While the application of specific rules may be plainly correct or incorrect, courts may have more leeway in reasonably applying more general rules in the context of a particular case. *Id.*

As to the "unreasonable determination of the facts" clause in Section 2254(d)(2), the Supreme Court's application of that section in *Wiggins v. Smith*, 539 U.S. 510 (2003), provides guidance. In *Wiggins*, the Court noted that a "clear factual error," such as making factual findings regarding the contents of social service records contrary to "clear and convincing evidence" presented by the defendant, constitutes an "unreasonable determination of the facts in light of the evidence presented." *Id.* at 528-29. In other words, a state court's determination of facts is unreasonable under Section 2254(d)(2) if its findings conflict with clear and convincing evidence to the contrary. This analysis mirrors the "presumption of correctness" afforded factual determinations made by a state court which can only be overcome by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1); *Mitchell v. Mason*, 325 F.3d 732, 737-38 (6th Cir. 2003); *Clark v. O'Dea*, 257 F.3d 498, 506 (6th Cir. 2001) ("[R]egardless of whether we would reach a different conclusion were we reviewing the case *de novo*, the findings of the state court must be upheld unless there is clear and convincing evidence to the contrary."). This presumption only applies to basic, primary facts, and not to mixed questions of law and fact. *See Mitchell*, 325 F.3d

at 737-38 (holding ineffective assistance of counsel is mixed question of law and fact to which the unreasonable application prong of Section 2254(d)(1) applies).

By its express terms, however, Section 2254(d)'s constrained standard of review only applies to claims that were adjudicated on the merits in the state court proceeding. *See Clinkscale v. Carter*, 375 F.3d 430, 436 (6th Cir. 2004). When a state court does not assess the merits of a petitioner's habeas claim, the deference due under AEDPA does not apply. In such a case, the habeas court is not limited to deciding whether the state court's decision was contrary to or involved an unreasonable application of clearly established federal law, but rather conducts a *de novo* review of the claim. *See Morales v. Mitchell*, 507 F.3d 916, 929 (6th Cir. 2007) (citations omitted); *Newton v. Million*, 349 F.3d 873, 878 (6th Cir. 2003); *Maples v. Stegall*, 340 F.3d 433, 436 (6th Cir. 2003). However, if the state court conducts a harmless error analysis but does not indicate whether its finding is based on state or federal constitutional law, a habeas court, while conducting an independent review of the facts and applicable law, must nonetheless determine "whether the state court result is contrary to or unreasonably applies clearly established federal law." *Maldonado v. Wilson*, 416 F.3d 470, 476 (6th Cir. 2005) (citing *Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000)).

## V.        Exhaustion and Procedural Default

### A.        Exhaustion

A state prisoner must exhaust his state remedies before bringing his claim in a federal habeas corpus proceeding. 28 U.S.C. § 2254(b), (c); *see Rose v. Lundy*, 455 U.S. 509, 522 (1982). Exhaustion is fulfilled once a convicted defendant seeks review of his or her claims on the merits from a state supreme court. *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). A

habeas petitioner satisfies the exhaustion requirement when the highest court in the state in which the petitioner has been convicted has had a full and fair opportunity to rule on the claims. *Rust v. Zent*, 17 F.3d 155, 160 (6th Cir. 1994) (citing *Manning v. Alexander*, 912 F.2d 878, 881 (6th Cir. 1990)). If, under state law, there remains a remedy that a petitioner has not yet pursued, exhaustion has not occurred, and the federal habeas court cannot entertain the merits of the claim. *See id.*[6]

A petitioner "'cannot obtain federal habeas relief under 28 U.S.C. § 2254 unless he has completely exhausted his available state court remedies to the state's highest court.'" *Buell v. Mitchell*, 274 F.3d 337, 349 (6th Cir. 2001) (quoting *Coleman v. Mitchell*, 244 F.3d 533, 538 (6th Cir. 2001)). Rather than dismiss certain claims the court deems unexhausted, however, a habeas court need not wait for exhaustion if it determines that a return to state court would be futile. *See Lott v. Coyle*, 261 F.3d 594, 608 (6th Cir. 2001). In circumstances where the petitioner has failed to present a claim in state court, a habeas court may deem that claim procedurally defaulted because the Ohio state courts would no longer entertain the claim. *See Buell*, 274 F.3d at 349. To obtain a merit review of the claim, the petitioner must demonstrate cause and prejudice to excuse his failure to raise the claim in state court, or that a miscarriage of justice would occur were the habeas court to refuse to address the claim on its merits. *Seymour v. Walker*, 224 F.3d 542, 550 (6th Cir. 2000) (citing *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977)).

**B.     Procedural Default**

In general, a federal court may not consider "contentions of federal law which are not resolved on the merits in the state proceeding due to petitioner's failure to raise them as

---

[6] The Court also notes that the *Perry* rule, discussed *infra*, would bar an Ohio court, on grounds of *res judicata*, from considering any issue that could have been, but was not, raised on direct appeal.

required by state procedure." *Sykes*, 433 U.S. at 87. If a "state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). To be independent, a state procedural rule and the state courts' application of it "must rely in no part on federal law." *Fautenberry v. Mitchell*, No. C-1-00-332, 2001 WL 1763438, at * 24 (S.D. Ohio Dec. 26, 2001) (citing *Coleman*, 501 U.S. at 732-733). To be adequate, a state procedural rule must be "'firmly established and regularly followed'" by the state courts at the time it was applied. *Beard v. Kindler*, – U.S. – , 130 S. Ct 612, 618 (2009) (quoting *Lee v. Kemna*, 534 U.S. 362, 375 (2002)). If a petitioner failed to timely present any federal habeas claims to the state courts but has no remaining state remedies, then the petitioner has procedurally defaulted those claims. *See Boerckel*, 526 U.S. at 848; *Rust*, 17 F.3d at 160.

In *Maupin v. Smith*, 785 F.2d 135 (6th Cir. 1986), the Sixth Circuit outlined the now familiar test to be followed when the State argues that a habeas claim is defaulted because of a prisoner's failure to observe a state procedural rule. The Circuit later summarized the *Maupin* four-part test as follows:

> First, the federal court must determine whether there is a state procedural rule that is applicable to the petitioner's claim and whether the petitioner failed to comply with that rule. Second, the federal court must determine whether the state courts actually enforced the state procedural sanction -- that is, whether the state courts actually based their decisions on the procedural rule. Third, the federal court must consider whether the state procedural rule is an adequate and independent state ground on which the state can rely to foreclose federal review of a federal constitutional claim. [. . .] Fourth, if the federal court answers the first three questions in the affirmative, it would not review the petitioner's procedurally

defaulted claim unless the petitioner can show cause for not following the procedural rule and that failure to review the claim would result in prejudice or a miscarriage of justice.

*Williams v. Coyle*, 260 F.3d 684, 693 (6th Cir. 2001) (citing *Maupin*, 785 F.2d at 138) (further citations omitted).

In determining whether the *Maupin* factors are met, the federal court looks to the "last explained state-court judgment." *Ylst v. Nunnemaker*, 501 U.S. 797, 805 (1991); *Combs v. Coyle*, 205 F.3d 269, 275 (6th Cir. 2000). "'[A] procedural default does not bar consideration of a federal claim on habeas corpus review unless the last state court rendering a reasoned opinion in the case clearly and expressly states that its judgment rests on a state procedural bar.'" *Morales*, 507 F.3d at 937 (quoting *Frazier v. Huffman*, 343 F.3d 780, 791 (6th Cir. 2003)). Conversely, if the last state court to be presented with a particular federal claim reaches the merits, then the procedural bar is removed and a federal habeas court may consider the merits of the claim in its review. *See Ylst*, 501 U.S. at 801.

If the first three *Maupin* factors are met, the claim is procedurally defaulted. However, the federal court may excuse the default and consider the claim on the merits if the petitioner demonstrates that (1) there was cause for him not to follow the procedural rule and that he was actually prejudiced by the alleged constitutional error, or (2) a fundamental miscarriage of justice would result from a bar on federal habeas review. *See Maupin*, 785 F.2d at 138; *Hutchison v. Bell*, 303 F.3d 720, 735 (6th Cir. 2002); *Combs*, 205 F.3d at 274-275 (citing *Coleman*, 501 U.S. at 750).

A petitioner can establish cause in two ways. First, a petitioner may "show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488 (1986); *Mohn v. Bock*, 208 F.

23

Supp. 2d 796, 801 (E.D. Mich. 2002). Objective impediments include an unavailable claim or interference by officials that made compliance impracticable. *Murray*, 477 U.S. at 488; *Mohn*, 208 F. Supp. 2d at 801. Second, constitutionally ineffective assistance of counsel constitutes cause. *Murray*, 477 U.S. at 488-489; *Rust*, 17 F.3d at 161; *Mohn*, 208 F. Supp. 2d at 804-05.

If a petitioner asserts ineffective assistance of counsel as cause for a default, that ineffective assistance claim must itself be presented to the state courts as an independent claim before it may be used to establish cause. *Murray*, 477 U.S. at 488-489. If the ineffective assistance claim is not presented to the state courts in the manner that state law requires, that claim is itself procedurally defaulted and can only be used as cause for the underlying defaulted claim if the petitioner demonstrates cause and prejudice with respect to the ineffective assistance claim. *Edwards v. Carpenter*, 529 U.S. 446, 452-53 (2000).

To establish prejudice, a petitioner must demonstrate that the constitutional error "'worked to his *actual* and substantial disadvantage.'" *Perkins v. LeCureux*, 58 F.3d 214, 219 (6th Cir. 1995) (quoting *United States v. Frady*, 456 U.S. 152, 170 (1982) (emphasis in original)). "When a petitioner fails to establish cause to excuse a procedural default, a court does not need to address the issue of prejudice." *Simpson v. Jones*, 238 F.3d 399, 409 (6th Cir. 2000) (citations omitted).

Because "the cause and prejudice standard is not a perfect safeguard against fundamental miscarriages of justice," the Supreme Court has recognized "a narrow exception to the cause requirement where a constitutional violation has 'probably resulted' in the conviction of one who is 'actually innocent' of the substantive offense." *Dretke v. Haley*, 541 U.S. 386, 392 (2004) (quoting *Murray v. Carrier*, 477 U.S. at 495-96). When the Supreme Court extended this exception to claims of capital sentencing error, it limited the exception in the capital sentencing

context to cases in which the petitioner could show "'by clear and convincing evidence that, but for constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty under the applicable state law.'" *Id.* (quoting *Sawyer v. Whitley*, 505 U.S. 333, 336 (1992)).

## VI.    Analysis of Grounds for Relief

### A.    First Ground for Relief -- Denial of Public Courtroom

Drummond asserts that his Sixth Amendment right to a public trial was violated when the trial court closed the courtroom for portions of his trial on February 4 and February 5. This issue was addressed by the Ohio Supreme Court on direct appeal and, therefore, this Court may review this ground for habeas relief.

### 1.    Factual Background and Procedural History

On February 4, 2004, the direct examination of James "Cricket" Rozenblad during Drummond's trial took place. (ECF. No. 35, Trial Tr. Vol. 14 at 2933-2951.) At the start, Rozenblad testified that he was nervous. (*Id*. at 2933.) Before his cross-examination began and immediately following the luncheon recess, outside the presence of the jury, the trial court announced:

> Ladies and gentlemen that are here to watch the trial, the Court is going to clear the courtroom for the remainder of the afternoon. You are invited back tomorrow morning at 9 o'clock in the morning. Okay? Deputies, clear the courtroom. And leave the building, not only to leave the courtroom but leave the building. See everybody tomorrow at 9:00.

(ECF No. 35, Trial Tr., Vol. 14, at 2967-68.)

After the courtroom was cleared of spectators, and still outside the presence of the jury, the trial court explained the reasons for the partial closure:

25

The Court: It's come to the attention of the Court that some of the jurors -- or witnesses feel threatened by some of the spectators in the court. The Court's making a decision that until we get through the next couple of witnesses I'm going to clear the courtroom. That includes the victim's family, the defendant's family and all other spectators. The Court had two incidents yesterday involving one of the spectators where he showed total disrespect to the Court in chambers and gave the deputies a very hard time. I didn't hold him in contempt of court, but just after that then another individual -- there was a physical altercation between that individual who also came to watch the trial. His name's Damian Williams. * * *

* * *

The Court: Who ultimately got charged with assault on a peace officer. So over the objection of the defendant I'm clearing the courtroom just for today only. Mr. Gentile?

[Defense Counsel] Mr. Gentile: Yes, your Honor. We would object to the Court's ruling. The defendant is entitled to a public trial under the United States Constitution. I don't disagree that there has been some sort of misconduct here that has been brought to my attention. However, that has not been attributable to the defendant, to Mr. Drummond, and we, therefore, don't think that he should be punished in terms of not having the support, people -- his family, that in the nature of this case, a capital case, that he would require making.

The Court: Just to perfect the record, I do believe that the one individual who was not charged with contempt of court yesterday, Michael Peace, is in fact John Drummond's brother.

[Prosecuting Attorney] Mr. Franken: No.

The Court: No?

Mr. Franken: Michael Peace says he's family. Others have said he isn't. He told Deputy Schmuck that he was family to Drummond. He's not a brother though.

The Court: Right. And we go back to when we were seating the jury and John Drummond approached a potential juror's husband in the jail, so. There's been a string of things. Just to make the record. * * *

* * *

The Court: * * * We would all agree that the media is permitted in so at least we have a record by a disinterested outside source.

26

Mr. Gentile: Yes, Your Honor.

The Court: Let me see the prosecutor. [sic] Kelly. I'm going to allow the press in at least so we can have --.

*Id.* at 2968-71 (ellipses added). Following this explanation, the jurors were brought in and the trial continued with only the parties, attorneys, court staff, and members of the media. The trial court memorialized its order in an entry dated February 5, 2004, stating, in full:

Due to the behavior of some of the Courtroom spectators and the fear of retaliation expressed by various witnesses, the Court, upon motion of the State, ordered all spectators removed from the Court for the duration of February 4, 2004 beginning at 1:30 p.m. This over the objection of the Defendant. The media will be permitted access.

(ECF No. 34, App. to Return, Vol. 2, at 81.) The clearing of the courtroom occurred for the testimony of three witnesses for the prosecution: James "Cricket" Rozenblad (cross-examination only), Nathaniel Morris, and Yaraldean Thomas, who were the last three witnesses for the day. *See Drummond,* 111 Ohio St. 3d at 22. After Rozenblad and Morris testified, they, too, were directed by the Court to "leave the building." (ECF No. 35, Trial Tr., Vol. 14, at 2993 (Rozenblad) 3061, (Morris).)

The next day, on February 5, 2004, prior to calling witness Leonard Schroeder, the prosecuting attorney asked for a side bar, after which the trial court announced in front of the jury:

[A]t this time I'm going to clear the courtroom until another witness is called. So for the people that are spectators in the courtroom, you may remain in the courthouse but you probably will not be permitted back in till about quarter till 3:00 or so.

(ECF No. 35, Trial Tr., Vol. 15, at 3262.) The court cleared the courtroom, again allowing only Drummond, attorneys, court staff, jurors, and members of the media to be present for the

27

testimony of Leonard Schroeder. *Id.* That same day, the trial court memorialized its order in an entry stating:

> Due to the safety concerns expressed by witness Leonard Schroeder Jr., the Court ordered the Courtroom closed (February 5, 2004) to all except the media during his testimony only. This without objection from either party.

(ECF No. 49, App. to Return, Vol. 2, at 82.)

Drummond appealed his conviction and sentence to the Ohio Supreme Court as of right. On November 4, 2005, the Ohio Supreme Court ordered supplemental briefing on the issue of whether the partial closures deprived Drummond of his Sixth Amendment right to a public trial. *Drummond*, 111 Ohio St. 3d at 19. The Ohio Supreme Court ultimately determined that Drummond's right to a public trial was not violated, and it affirmed his conviction and sentence. *See id.* at 24; *infra*.[7]

Drummond alleges in his Amended Petition that he was deprived of his right to a public trial.

### 2.    Analysis

Drummond contends that the February 4 and February 5 partial closures each violated his Sixth Amendment right to a public trial. Drummond procedurally defaulted his claim with respect to the February 5 partial closure. As to the February 4 partial closure, this Court finds that the Ohio Supreme Court's rejection of Drummond's claim was objectively unreasonable. Each will be discussed *seriatim*.

---

[7] The Ohio Supreme Court denied Drummond relief on his public trial claim by a 4-3 vote. The dissent would have overturned Drummond's conviction on the grounds that the partial courtroom closure on February 4, 2004, resulted in structural error. *Drummond*, 111 Ohio St. 3d at 52-55.

### a.    February 5 Partial Closure

The Ohio Supreme Court held that Drummond failed to object to the February 5 partial closure, and thus his claim of right to a public trial was waived with respect to that partial closure. *Drummond*, 111 Ohio St. 3d at 24. "The failure to object contemporaneously is a generally recognized, firmly established independent and adequate state law ground for refusing to review trial errors." *Burton v. Bock*, 187 F. App'x 465, 470 (6th Cir. 2006) (citing *Coleman*, 501 U.S. at 747). Because Drummond failed to comply with a state procedure to have his February 5 partial closure claim heard by the state courts, he has procedurally defaulted this claim. *Edwards*, 529 U.S. at 451. Thus, for his claim to be cognizable in this Court, Drummond must show cause and prejudice for his procedural default. *Id.*

Drummond argues that his trial counsel were ineffective for failing to object to the February 5 partial closure, and that this constitutes cause for his procedural default. As stated above, ineffective assistance of counsel can constitute cause and prejudice excusing a procedural default of an underlying claim. *Beuke v. Houk*, 537 F.3d 618, 631 (6th Cir. 2008) (citing *Franklin v. Anderson*, 434 F.3d 412, 418 (6th Cir. 2006)). However, a claim of ineffective assistance of counsel, asserted as cause for procedural default, can itself be procedurally defaulted. *Edwards*, 529 U.S. at 452-53. In his briefing, Drummond never presented to the Ohio Supreme Court the issue of ineffective assistance with respect to failing to object to the February 5 partial closure.

Drummond argues that a closed, off-record, in-chambers discussion preceded the trial judge's decision to close the courtroom on February 5, 2004, and that, as a result, "there is no indication in the transcript as to whether or not Drummond or his defense counsel *did* object

29

in chambers to the subsequent closure." (ECF No. 57, at 10 (emphasis in original).) Put another way, Drummond argues that, because there was no record as to whether his trial counsel objected to the February 5 partial closure, his appellate counsel were unable to raise ineffective assistance for failure to object, which constitutes "cause" for his failure to raise the issue on appeal. Drummond's argument lacks merit. Although he is correct that the in-chambers discussion was not recorded, a February 5, 2004 entry by the trial court stated that the February 5 partial closure was "without objection from either party." *Drummond*, 111 Ohio St. 3d at 21. The trial court's entry placed Drummond's appellate counsel on notice that trial counsel failed to object to the February 5 partial closure, and thus there was no "objective factor external to the defense [that] impeded counsel's efforts" to raise the issue on appeal. *Coleman*, 501 U.S. at 752.

Drummond also argues that he made "efforts in state court to address his counsel's ineffectiveness for allowing the closure of the courtroom in the only way he could," namely, ineffective assistance for failing to request that all sidebar conferences be recorded. (ECF No. 57, at 10.) This does not rescue Drummond from procedural default. Even if it is true that one of the unrecorded sidebar conferences involved matters pertaining to the February 5 partial closure, "[i]t is not enough that all the facts necessary to support the federal claim were before the state courts [. . .]." *Anderson v. Harless*, 459 U.S. 4, 6 (1982); *see also Lott*, 261 F.3d at 607. Rather, a petitioner must present "the same claim under the same theory" to the state courts. *Caver v. Straub*, 349 F.3d 340, 346 (6th Cir. 2003) (citation omitted). As Drummond did not present to the Ohio courts the theory of ineffective assistance for failure to object to the February 5 partial closure, he failed to exhaust that claim before the Ohio courts.

30

Drummond's ineffective assistance claim with respect to the failure to object to the February 5 partial closure is procedurally defaulted and, therefore, so is his claim that the February 5 partial closure violated his Sixth Amendment rights.

**b.** **February 4 Partial Closure**

Drummond also asserts that he is entitled to habeas relief because the February 4 partial closure violated his right to a public trial. The right to a public trial is guaranteed by the Sixth Amendment, and a violation of such a fundamental right constitutes structural error. *Johnson v. United States*, 520 U.S. 461, 468-69 (1997). That is, because the "defect affect[s] the framework within which the trial proceeds," *Arizona v. Fulminante*, 499 U.S. 279, 310 (1991), it "def[ies] analysis by 'harmless-error' standards." *Id.* at 309.

As stated above, the finding by a majority of the Ohio Supreme Court that the trial court did not commit structural error in ordering the partial closure of the courtroom and that Drummond's right to a public trial was not violated by the February 4 partial closure is subject to AEDPA's deferential standard of review.[8] While numerous modern Supreme Court decisions have analyzed courtroom closures under the First Amendment, at the time the Ohio Supreme Court decided *Drummond*, the only relevant Supreme Court decision reviewing a courtroom

---

[8] Drummond did not actually raise this Sixth Amendment issue on direct appeal. The Ohio Supreme Court raised it *sua sponte* and asked for briefing. It undoubtedly relied upon its right to do so because of the importance of the issue, the gravity of the particular appeal, and the recognition that it should have the first opportunity to correct any constitutionally infirm state court conviction or sentence. *See, e.g.*, *State v. Williams*, 38 Ohio St. 3d 346, 347 (1988) ("Because of the gravity of the sentence that has been imposed on appellant, we have reviewed the record with care for any errors that may not have been brought to our attention. In addition, we have considered any pertinent legal arguments which were not briefed or argued by the parties."); *see also State v. Zuern*, 32 Ohio St. 3d 56, 63 (1987) ("[B]ecause of the nature of the case and the exacting review necessary where the death penalty is involved, we reserve the right to consider the constitutional challenges in particular cases."); *Ylst v. Nunnemaker*, 501 U.S. 797, 801 (1991) (noting that state procedural bars "are not immortal" and "may expire because of later actions by state courts"). Because the Ohio Supreme Court considered this ground on the merits, even though *sua sponte*, and examined it from the standpoint of structural error not merely plain error (unlike Ground Eight, Sub-claim 1), there is no problem of either failure to exhaust or procedural default. The Respondent has not argued otherwise and, in fact, admits that the claim is not defaulted.

closure under the Sixth Amendment was *Waller v. Georgia*, 467 U.S. 39 (1984).[9] In *Waller*, a

Georgia state trial court had closed an entire suppression hearing to all but witnesses, court

personnel, the parties, and their attorneys. *Id.* at 42. The trial court ordered the closure to prevent

unnecessary "publication" of information contained in wiretaps, which would render evidence

tainted and inadmissible under Georgia wiretap law. *Id.* (citing Ga. Code Ann. § 26-3004(k)

(1977 & Supp. 1981)). On appeal, the parties agreed that fewer than two and a half hours of the

seven-day hearing were devoted to playing audio recordings that were subject to the wiretap law.

*Id.* The Georgia Supreme Court affirmed petitioners' convictions and ruled that "the trial court

had properly balanced petitioners' rights to a public hearing against the privacy rights of others

under Georgia law and the Sixth Amendment." *Id.* at 43 (citation omitted).

The United States Supreme Court began its review of the Georgia Supreme

Court's ruling by noting that "the right to an open trial" is not absolute, and "may give way in

certain cases to other rights or interests […]." *Id.* at 45. The Court cautioned, however, that there

is a "presumption of openness" and, therefore, the "balance of interests must be struck with

special care." *Id.* It then applied precedent of the First Amendment courtroom closure cases,

specifically "the tests set out in *Press-Enterprise* and its predecessors" under which: (1) "the

party seeking to close the hearing must advance an overriding interest that is likely to be

prejudiced" if the courtroom remains open; (2) "the closure must be no broader than necessary to

protect that interest[;]" (3) "the trial court must consider reasonable alternatives to closing the

proceeding[;]" and (4) "it must make findings adequate to support the closure." *Id.* at 47, 48

(citation omitted). Before ordering a closure, a trial court must render "'findings specific enough

---

[9] The modern Supreme Court's cases concerning the First Amendment right to a public trial decided prior to *Drummond* included *Press-Enterprise Co. v. Superior Court of Cal., Riverside County*, 464 U.S. 501 (1984); *Globe Newspaper Co. v. Superior Court for Norfolk County*, 457 U.S. 596 (1982); *Richmond Newspapers, Inc. v. Commonwealth of Virginia*, 448 U.S. 555 (1980); and *Gannett Co. v. DePasquale*, 443 U.S. 368 (1979).

that a reviewing court can determine whether the closure order was properly entered.'" *Id.* at 45 (quoting *Press-Enterprise*, 464 U.S. at 510).

Applying this test, the Supreme Court first noted that the purported interest of "protecting the privacy of persons not before the court […] may well justify closing portions of a suppression hearing to the public." *Id.* at 48. The Court found, however, that the prosecution, in seeking the closure, "was not specific as to whose privacy interests might be infringed, how they would be infringed, what portions of the [evidence] might infringe them," and, "[a]s a result, the trial court's findings were broad and general, and did not purport to justify the closure of the entire hearing." *Id.* Further, the trial court "did not consider alternatives to immediate closure of the entire hearing" and, consequently, "the closure was far more extensive than necessary." *Id.* at 48-49. Accordingly, the Supreme Court held that the Georgia trial court had violated petitioner's Sixth Amendment right to a public trial.

In *Drummond*, the Ohio Supreme Court relied on *Waller* in reviewing the trial court's February 4 closure but adopted a modified version of the test articulated by the United States Supreme Court. The court explained:

> *Waller* dealt with the suppression hearing during which all persons other than witnesses, court personnel, the parties, and their lawyers were excluded for the entire duration. [citation omitted] This case differs, as it deals with partial closure of a trial. The trial court excluded members of the public and the defendant's family, but did so only for the length of a single cross-examination and two other witnesses' testimony. The trial court permitted media representatives to remain in the courtroom throughout the testimony of these witnesses. Federal courts have concluded that when a trial judge orders a partial, as opposed to a total, closure of a court proceeding, a "substantial reason" rather than *Waller*'s "overriding interest" will justify the closure.

*Drummond*, 111 Ohio St. 3d at 22 (citing *Woods v. Kuhlmann*, 977 F.2d 74, 76 (2d Cir. 1992); *United States v. Sherlock*, 962 F.2d 1349, 1357 (9th Cir. 1989); *Nieto v. Sullivan*, 879 F.2d 743, 753 (10th Cir. 1989); *Douglas v. Wainwright*, 739 F.2d 531, 533 (11th Cir. 1984)).

The Ohio Supreme Court properly noted that *Waller* addressed a total closure of a courtroom, while the trial court in *Drummond* only partially closed the courtroom. At the time the Ohio Supreme Court decided *Drummond*, the United States Supreme Court had not analyzed the extent of a petitioner's Sixth Amendment right to a public trial when the courtroom was only partially closed either to a particular person or for a limited duration. Indeed, the Court did not conduct such a review until very recently. *See Presley v. Georgia,* -- U.S. -- , 130 S. Ct. 721 (2010). In *Presley*, the Court reviewed the Georgia Supreme Court's determination that there was no violation of the defendant's Sixth Amendment right to a public trial when the trial court totally excluded the public from observing the *voir dire* portion of petitioner's criminal trial. In its analysis, the Court applied the four-part *Waller* test. *Id.* at 724 (quoting *Waller*, 467 U.S. at 48).

The decision of the Ohio Supreme Court in *Drummond*, however, was decided a little over three years before *Presley* when there was no clearly established federal law concerning partial courtroom closures. Indeed, at the time *Drummond* was decided, circuit courts disagreed whether *Waller* strictly extended to partial closure cases like the one at issue here, and many opted to apply a modified *Waller* test. *Compare United States v. Osborne*, 68 F.3d 94, 98-99 (5th Cir. 1995) (noting that the Second, Eighth, Ninth, Tenth, and Eleventh Circuits all applied a modified *Waller* test to partial closings and itself applying that modified test) (citations omitted), *with Walton v. Briley*, 361 F.3d 431, 433 (7th Cir. 2004) (applying *Waller* test, without any modifications, to partial closure). Several circuits held that the first part of the *Waller* test

34

was met where there was a "substantial reason" justifying a partial closure rather than an "overriding interest." These courts reasoned that a less strict standard was all that was required because a partial closure does not implicate the same secrecy and fairness concerns of a total closure. *E.g., Garcia v. Bertsch*, 470 F.3d 748, 753 (8th Cir. 2006); *Osborne*, 68 F.3d at 98-99; *Woods*, 977 F.2d at 76; *Sherlock*, 962 F.2d at 1357; *Nieto*, 879 F.2d at 753; *Douglas*, 739 F.2d at 533. The circuits agreed, however, that the remaining three parts of the *Waller* test should be applied without modification.

While *Presley* now makes it clear that there must be an "overriding interest," as pronounced in *Waller*, to justify even a partial courtroom closure, this Court may only address whether the Ohio Supreme Court's requirement of "a substantial interest" rather than "an overriding interest" was, at that time, an unreasonable application of *Waller*, not whether it was incorrect. *See* 28 U.S.C. § 2254(d)(1); *see also Renico v. Lett*, -- U.S. --, 130 S.Ct. 1855, 1862 (2010) (citing *Williams v. Taylor*, 529 U.S. 362, 410 (2000)). In light of the existing disagreement about the precedent created by *Waller* at the time the Ohio Supreme Court decided *Drummond*, this Court cannot say that it was objectively unreasonable for it to apply a modified *Waller* test.[10] The reasonable adaptation of the *Waller* test, however, does not automatically render the Ohio Supreme Court's application of that test reasonable. Mindful of the deference

---

[10] The Supreme Court's declaration in *Presley* that "*Waller* provided standards for courts to apply before excluding the public from any stage of a criminal trial," *Presley*, 130 S. Ct. 724, does not demonstrate that it was unreasonable for a court to seek a "substantial" rather than an "overriding" interest. As evidenced by the precedent cited above, the circuits were divided over how to apply the *Waller* test to partial closures. Likewise, the Sixth Circuit's recent decision, *Johnson v. Sherry*, 586 F.3d 439 (6th Cir. 2009), *cert. denied*, -- S. Ct. --, 2010 WL 1789342 (Oct. 4, 2010), was not yet rendered at the time the Ohio Supreme Court considered the issue and, therefore, was also unavailable for consideration. While the *Sherry* decision analyzed whether counsel's failure to object to a courtroom closure constituted ineffective counsel, its dicta indicates the Sixth Circuit would have required a finding of an "overriding interest" to justify a partial closure. *Id.* at 445. Such hindsight, however, does not render the Ohio Supreme Court's decision to apply a "substantial" interest analysis unreasonable. Nor may this Court rely on any circuit decision to determine whether a state court decision was contrary to, or an unreasonable application of, clearly established federal law. *Herbert v. Billy*, 160 F.3d 1131, 1135 (6th Cir. 1998).

owed under AEDPA, this Court shall review the Ohio Supreme Court's decision concerning each part of the modified *Waller* test for reasonableness.

Before turning to the *Waller* analysis, however, it should be noted that, although the Sixth Amendment right to a public trial is the right of the accused alone,

> [t]here can be no blinking the fact that there is a strong societal interest in public trials. Openness in court proceedings may improve the quality of testimony, induce unknown witnesses to come forward with relevant testimony, cause all trial participants to perform their duties more conscientiously, and generally give the public an opportunity to observe the judicial system.

*Gannett Co. v. DePasquale*, 443 U.S. 368, 383 (1979). Or, in the words of Justice Harlan: "Essentially, the public-trial guarantee embodies a view of human nature, true as a general rule, that judges, lawyers, witnesses, and jurors will perform their respective functions more responsibly in an open court than in secret proceedings. A fair trial is the objective, and 'public trial' is an institutional safeguard for attaining it." *Estes v. Texas*, 381 U.S. 532, 588 (1965) (Harlan, J., concurring) (citing *In re Oliver*, 333 U.S. 257, 266-73 (1948)).

The Ohio Supreme Court in *Drummond* held that the inclusion of the media served to protect these societal interests and stated: "media presence helped safeguard Drummond's right to a public trial. Indeed, the witnesses' awareness of the media minimizes the risk that they would alter their testimony when the proceeding was partially closed." 111 Ohio St. 3d at 22. It continued: "Moreover, the transcript of the trial became a public record. In sum, we find none of the secrecy prohibited by the Sixth Amendment." *Id.* at 22-23 (citing *Sherlock*, 962 F.2d at 1358). As one circuit court noted, however, the fact that a trial court permitted the media to be present during a partial closure of the courtroom does not guarantee media presence and thus, in and of itself, does not automatically cure Sixth Amendment deficiencies:

> Simply *allowing* the press to be present, however, does not serve the same
> purpose as allowing the public to be present, for the press is not the public, and
> the Sixth Amendment guarantees a *public* trial. It is only as a fiduciary for the
> public that the presence of the press mitigates against what otherwise would be a
> closed, non-public trial. Thus, in certain cases, the presence of the press has been
> held to safeguard the public trial right, the press serving as a fiduciary for the
> public, not because they were *allowed* to be present, but because they were
> present and reported the trial activities and informed the public of that which the
> public was unable to experience first-hand because of the closure order. It does
> not follow logically that because the Sixth Amendment requires only that the
> *public* be *allowed* to be present that where the public is excluded but the *press* is
> *allowed* to remain the Sixth Amendment right is not infringed. *If the press is not
> actually acting as fiduciary for the public, then a partial closure is no different
> than an absolute closure* [...].

*Douglas v. Wainwright*, 714 F.2d 1532, 1542-43 (11th Cir. 1983) (citation omitted; final

emphasis added), *vacated and remanded*, 468 U.S. 1206 (1984), *reaffirmed* 739 F.2d 531 (11th

Cir. 1984). The court in *Douglas* concluded: "The determination of the degree of press coverage,

therefore, is necessary to a determination of the extent to which the public trial was infringed."

*Id*. at 1543.

Here, no evidence of media presence during the entire closure was presented by

the State, nor did it present any evidence that the closed portions of the trial were reported by the

media, much less reported accurately.[11] It would be improper for this Court to presume either the

media's presence or its accurate reporting. While the presence of the media certainly may

address the societal need for public trials, it cannot act as an absolute substitute where, as here, it

cannot be determined from the record that the media was present for the entire duration of the

---

[11] Petitioner claims that "[t]he media comprised only of print reporters. Broadcast reporters were also excluded."
(ECF No. 45 at 19 (citing ECF No. 35, Vol. 15, Trial Tr. at 3267).) Nothing in the oral or written courtroom closure
order, however, excluded the media in the manner suggested by Petitioner. Rather, the portion of the trial he
references indicates that, on February 5, the trial court stated during Schroeder's direct testimony that people
moving in the back of the courtroom were "[j]ust news people. There's no camera or anything, so no one's going to
photograph you." Accordingly, this Court cannot find that the trial court excluded any media from the courtroom on
February 4.

closure. Moreover, as noted by the dissent in the Ohio Supreme Court decision and as discussed further below, "it cannot be reasonably argued that the news reporters who remained in the courtroom can stand in the shoes of members of defendant's family." *Drummond*, 111 Ohio St. 3d at 53 (Moyer, C.J., dissenting); *see also In Re Oliver*, 333 U.S. 257, 271-72 (1948). This Court thus reviews the Ohio Supreme Court's application of *Waller* without assuming the curative effect of the media, who may or may not have been present during the duration of the closure and who may or may not have accurately reported to the general public while the public was excluded from the courtroom.

### i.    Substantial Reason

Concerning the first part of the *Waller* test, the Ohio Supreme Court found that "the trial court's interest in maintaining courtroom security and protecting witness safety supported the trial court's limited closure of the courtroom." *Drummond*, 111 Ohio St. 3d at 22. The court concluded the advanced interest was "substantial" because the trial court noted that there had been "a physical altercation between a spectator and courtroom deputies, and a second incident occurred in the judge's chambers[,]" and that "fear of retaliation [was] expressed by various witnesses […]." *Id.* The Ohio Supreme Court additionally, and without reference to any finding of the trial court, found a substantial interest because of "the dangerous nature of gang violence and the genuine need to protect witnesses testifying against gang members from the deadly threat of retaliation." *Id.* As discussed above, given the state of the law at the time, this Court finds that the Ohio Supreme Court's application of *Waller* to require a "substantial," as opposed to an "overriding," interest was not unreasonable. It must determine, however, whether it was unreasonable for the Ohio Supreme Court to conclude that there was a "substantial reason" for the closure on February 4.

The Supreme Court has held unconstitutional under the First Amendment at least one statute that issued a blanket closure. *See, e.g., Globe Newspaper Co. v. Superior Court for Norfolk County*, 457 U.S. 596 (1982). In *Globe Newspaper*, the Court held unconstitutional a Massachusetts statute that required trial courts to automatically exclude the press and the general public from the courtroom during testimony of minors who were victims of sexual abuse. The Court agreed with the State that its interest in safeguarding the physical and psychological well-being of minors was a compelling one, "[b]ut as compelling as that interest is," the Court held that it did "not justify a *mandatory* closure rule, for it is clear that the circumstances of the particular case may affect the significance of the interest. A trial court can determine on a case-by-case basis whether closure is necessary to protect the welfare of a minor victim." *Id.* at 607-08. Courts, relying on *Globe Newspaper*, have held that trial courts must make similar case-by-case determinations before closing a courtroom under the Sixth Amendment. *See, e.g., Davis v. Reynolds*, 890 F.2d 1105, 1110 (10th Cir. 1989). As the Tenth Circuit summarized, failure to make "any inquiry or findings concerning the specific condition of the witness in [a particular] case, is essentially equivalent to the blanket legislative closure rejected in *Globe Newspaper*" and thus is unconstitutional. *Davis*, 890 F.2d at 1111. In the instant case, the Ohio Supreme Court, without reference to any finding of the trial court, "acknowledge[d] the dangerous nature of gang violence and the genuine need to protect witnesses testifying against gang members from the deadly threat of retaliation" to support its finding of a substantial interest for the closure. *Drummond*, 111 Ohio St. 3d at 22. Such a blanket assertion does not support a substantial interest.

In short, a substantial interest cannot be advanced without being defined. A substantial interest may, therefore, be found where the trial court makes specific inquiries

concerning the reason for closure, such as inquiring about a particular witness's fear of testifying. *See, e.g., Woods*, 977 F.2d at 75 (affirming denial of habeas relief where trial court learned from prosecution that eye witness was threatened by at least one member of accused's family, justifying exclusion of all of accused's family members for duration of her testimony); *Neito*, 879 F.2d at 749 (affirming denial of habeas relief where trial court learned witness "worried about testifying since two of the assailants were still at large"). On the other hand, a substantial interest cannot be found if the trial court makes no inquires about a particular witness's alleged fear. *E.g., Guzman v. Scully*, 80 F. 3d 772, 775-76 (2d Cir. 1996). In sum, if a witness's fear is the advanced interest, the trial court must inquire as to which witness is afraid and as to the nature of his or her fears.

Here, the trial court made no specific inquiries on the record about who was feeling threatened by whom, but only generally stated that "some of the jurors – or witnesses feel threatened by some of the spectators in the court." *Drummond*, 111 Ohio St. 3d at 19. Similarly, the trial court's order closing the courtroom that was issued the following day did not identify who was threatening whom but merely cited "the behavior of *some* of the Courtroom spectators and the fear of retaliation expressed by *various* witnesses" as the reason for the closure. *Id.* at 20 (emphases added). Indeed, nowhere in the trial record is it discussed by any party which witnesses were frightened or which spectators were threatening witnesses.[12] *See id.* at 52-53 (Moyer, C.J., dissenting) ("The record also does not support closing the courtroom because of the 'fear of retaliation expressed by various witnesses,' because no such witnesses were

---

[12] This Court has no basis to assume that the two spectators, Michael Peace and Damian Williams, identified by the trial court as having caused disturbances on February 3, were threatening any witnesses. Indeed, Rozenblad, whose cross-examination was closed to the public, testified that Michael Peace was his friend. (ECF. No. 35, Trial Tr., Vol. 14, at 2933.) Thus, it would not be reasonable for any court to assume that Rozenblad felt threatened by Peace.

identified."). Without such a record, it was unreasonable for the Ohio Supreme Court to ascertain that the advanced interest was substantial.

While the witnesses cannot be identified by review of the trial record, in contrast, the "jurors" also referenced by the trial court at the time it issued the closure can be identified. At the time of the closure, the trial court generally stated "when we were seating the jury […] Drummond approached a potential juror's husband in the jail […]." *Drummond*, 111 Ohio St. 3d at 20. Review of the transcript during *voir dire* clarifies the name of this potential juror and the nature of her fear (*i.e.*, her husband worked in the jail where Drummond was incarcerated and was approached by Drummond who stated personal things about his wife, such as the fact that she was pregnant). (*See* ECF No. 35, Trial Tr., Vol. 11, at 2329-30.) This juror was excused for cause during jury selection and thus did not participate in the trial. (*Id.*) Accordingly, fears expressed by this potential juror, although identifiable from the record, could not have reasonably constituted a substantial interest that might justify closure on February 4.

Likewise, as the dissent in *Drummond* pointed out, the two incidents mentioned by the trial court concerning general courtroom security also could not justify the closure on February 4 because they "had occurred *the previous day*." *Id.* at 52 (Moyer, C.J., dissenting) (emphasis in original). Even if those incidents occurred at the end of February 3, the trial proceeded the following morning without any reference to them and, apparently, without any security concerns. (ECF No. 35, Trial Tr., Vol. 13, at 2844.) In other words, it is not evident from the trial transcript how these disturbances could constitute an immediate threat to courtroom security on the afternoon of February 4. Moreover, the perpetrators of each incident were known by the trial court and could have easily been excluded from the remaining proceedings to address any security threat that those individuals posed. *Drummond*, 111 Ohio St.

41

3d at 20. The trial judge made no such exclusionary order. This Court finds no basis upon which it may find that either incident posed an immediate threat to courtroom security. In sum, given the trial record, neither incident may reasonably be said to constitute a substantial interest justifying the closure on February 4.

Accordingly, this Court finds that it was an unreasonable application of *Waller* for the Ohio Supreme Court to find that the prosecution had advanced a substantial interest to justify the closure on February 4.

### ii.    Closure No Broader than Necessary

The Ohio Supreme Court also found that "the closure was no broader than necessary," applying the second part of the *Waller* test. *Drummond*, 111 Ohio St. 3d at 22. The court reasoned that closure was sufficiently tailored because

> [t]he courtroom was closed only while Rozenblad was cross-examined and while Morris and Thomas testified. Spectators were readmitted afterwards. Also, the trial judge provided expressly that the media could remain in the courtroom during the testimony of all these witnesses.  […] Moreover, the transcript of the public trial became a public record.

*Drummond*, 111 Ohio St. 3d at 22. In short, the Ohio Supreme Court held that because the closure lasted for one cross-examination and two full examinations (as opposed to the entire trial), the media was present, and the trial transcript became public record, the closure was no broader than necessary. Yet, nowhere does it explain the basis of this holding.

The United States Supreme Court has noted: "Our cases have uniformly recognized the public trial guarantee as one created for the benefit of the defendant." *Gannett Co. v. DePasquale*, 443 U.S. 368, 380 (1979). But the Court has never specified whose presence, at a minimum, must be allowed to ensure a defendant a constitutionally guaranteed public trial. *But see In re Oliver*, 333 U.S. 257, 259 (1948) (conviction for contempt with only judges and

42

perhaps staff members and prosecutor present violates right to public trial). The Court has, however, noted in dicta that "without exception all courts have held that an accused is at the very least entitled to have his friends, relatives and counsel present, no matter with what offense he may be charged." *Id.* at 271-72.

Here, petitioner's counsel explicitly argued that the closure should not extend to Drummond's family. *Drummond*, 111 Ohio St. 3d at 20 ("I don't disagree that there has been some sort of misconduct here that has been brought to my attention. However, that has not been attributable to the defendant, to Mr. Drummond, and we, therefore, don't think that he should be punished in terms of not having the support, people – his family, that in the nature of this case, a capital case, that he would require making.") Nonetheless, the trial court did not permit Drummond's family to attend and made no findings explaining why Drummond's family should be excluded.[13]

Habeas courts generally require lower courts to offer some rationale justifying the extent of the closure to determine whether it was sufficiently tailored. *E.g., Woods*, 977 F.2d at 77 ("Having determined that the trial judge adequately assessed the scope of [the testifying eyewitness's] fear, we disagree with [petitioner's] contention that the closure order was broader than necessary"). Such rationale is particularly important where the exclusion extends to petitioner's family members. *E.g., LaPlante v. Crosby*, 133 Fed. App'x 723, 726 (11th Cir. 2005)

---

[13] The aforementioned disturbances on February 3 may have initially caused the trial court to extend the closure to Drummond's family. The trial court appears to have thought that one person who caused a disturbance, Michael Peace, was part of Drummond's family. *Drummond*, 111 Ohio St. 3d at 20 (The Court: "Just to perfect the record, I do believe that the one individual who was not charged with contempt of court yesterday, Michael Peace, is in fact John Drummond's brother."). The prosecution clarified that Peace was not, in fact, a member of Drummond's family. *Id.* (Prosecution "Mr. Franken: Michael Peace says he's family. Others have said he isn't. He told Deputy Schmuck that he was family to Drummond. He's not a brother though."). Despite this correction, made before the trial continued under the closure order, the trial court nonetheless did not allow any member of Drummond's family to attend the remainder of the February 4 proceedings. Accordingly, that misunderstanding could not have been the justification for the trial court's decision to exclude Drummond's family.

(finding second part of *Waller* test met where petitioner "objected to the exclusion of members of his family, the trial court found that the protection of the [witness, a child who was a victim of sexual abuse] (a compelling state interest under *Globe Newspaper*) required the family members to be excluded along with the general public"); *English v. Artuz*, 164 F.3d 105, 109 (2d Cir. 1998) (finding second part of *Waller* test not met where trial court failed to justify exclusion of accused's family members).

Here, the trial court offered no specific rationale justifying the extent of its closure. For example and as discussed above, there were no findings that any particular witness felt threatened by any particular spectator. Likewise, there were no findings that Drummond's family posed any threat. Under such circumstances, a reviewing court cannot assess whether the trial court's closure was narrowly tailored. *See, e.g., Guzman*, 80 F.3d at 776 ("With the interest in favor of closure merely alleged but not established, there could be no compliance with the second requirement that the closure be 'no broader than necessary to protect' the interest.") (quoting *Waller*, 467 U.S. at 48). The Ohio Supreme Court nonetheless held the closure was sufficiently tailored. This Court finds this to be an unreasonable application of *Waller*.

Furthermore, this Court disagrees with the Ohio Supreme Court's assumption that because the closure was of a "limited" duration, one cross-examination and two full examinations, it was necessarily sufficiently tailored. 111 Ohio St. 3d at 22. Crucially, the Ohio Supreme Court neglected to consider the importance of the testimony of these witnesses. *See, e.g., Judd v. Haley*, 250 F.3d 1308, 1317 (11th Cir. 2001) (finding *Waller* test not met and noting that "the record reflects a total closure of the courtroom during the testimony of a critical witness"); *English,* 164 F.3d at 108 ("The extent of the closure takes into consideration the duration of the closure and importance of the testimony rendered while the courtroom was closed

44

[…].") (citation omitted); *cf. Tillman v. Bergh*, No. 2:06cv11555, 2008 WL 6843654, at *12 (E.D. Mich. July 2, 2008) (finding no Sixth Amendment violations and noting the triviality of the closure because it lasted the duration of a single witness, a 911 operator whose testimony "lasted only four minutes, and was limited to whether the clocks on patrol car cameras and computers are synchronized with the clock on the computers at Central Dispatch.") As the dissent in *Drummond* pointed out:

> Thomas, Morris, and Rozenblad were key prosecution witnesses, and their testimony was crucial in securing Drummond's conviction. Thomas saw Drummond with an assault rifle prior to the shooting and overheard Drummond tell Gilliam "It's on" before the shootings. Morris was in pretrial confinement with Drummond and overheard him tell another inmate that "he didn't meant [sic] to kill the baby; he was trying to get at somebody else * * *." Rozenblad testified on direct examination (in the presence of spectators) that he saw Drummond before the shooting talking "about a guy moving in * * * [their] neighborhood [who] could have had something to do with the death of Brett Schroeder." During cross-examination, when the courtroom was closed, Rozenblad testified that he did not get along with Drummond and that they were never friends.

*Drummond,* 111 Ohio St. 3d at 53 (Moyer, C.J., dissenting) (alterations in original). Although, for reasons discussed under Ground Two below, this Court does not agree with the characterization of these witnesses as *key* witnesses, it does find that they were *important* witnesses and disagrees that closure during such important testimony could be considered "limited." By extension, it also cannot agree that the closure was, thus, inherently narrowly tailored.

Accordingly, this Court finds that the Ohio Supreme Court's holding that the closure was no broader than necessary was an unreasonable application of *Waller*.

### iii.    Consideration of Alternatives

The Ohio Supreme Court acknowledged that the trial court did not explicitly consider alternatives to the partial closure, as required by the third part of *Waller*, but

45

nonetheless found this part of the test was met because "the partial closure of the courtroom [. . .] is narrower than full closure for the entire trial." *Drummond*, 111 Ohio St. 3d at 23. At best, the Ohio Supreme Court implied that, in ordering a partial closure, the trial court must have considered and rejected the more rigid alternative of a complete closure. Nothing in the trial record, however, reflects that the trial court considered any alternatives. Under *Waller*, the trial court should have considered alternatives on a reviewable record, and that was not done in this case. *See Waller*, 467 U.S. at 48; *see also Judd*, 250 F.3d at 1318 (affirming grant of habeas relief in part because trial court failed to consider alternatives on the record).

In his dissent in *Presley*, Justice Thomas, joined by Justice Scalia, contests the majority's characterization of *Press-Enterprise* and *Waller* as requiring the trial courts to *sua sponte* consider alternatives and asserts that neither decision "'explicit[ly]' places on trial courts the burden of *sua sponte* suggesting alternatives to closure 'absent an opposing party's proffer of some alternatives.'" 130 S. Ct. at 727 (Thomas, J., dissenting) (quoting majority opinion, *id.* at 724; alterations in original); *see also Ayala*, 131 F.3d at 71 ("[W]e see nothing in [. . .] *Waller* to indicate that once a trial judge has determined that limited closure is warranted as an alternative to complete closure, the judge must *sua sponte* consider further alternatives to the alternative deemed appropriate."); *accord Bell*, 236 F.3d at 169-70; *Gibbons v. Savage*, 555 F.3d 112, 117-18 (2d Cir. 2009). This Court need not address whether the Ohio Supreme Court should have held that the trial court was required to considered alternatives *sua sponte* because as explained above, the trial court was presented with at least one alternative by Drummond's counsel, *i.e.*, that Drummond's family be permitted to attend. *Drummond*, 111 Ohio St. 3d at 19. There is no indication in the record that the trial court considered this alternative or, if it did, why the alternative was rejected. This Court finds that this flat rejection, without explanation, cannot

46

constitute proof that the trial court actually considered the proposed alternative, and thus does not meet the third part of the *Waller* test.

Further, as the dissent pointed out: "Damian Williams and Michael Peace were identified by the trial court as having been involved in the disturbances the previous day. Thus, the trial court could have barred Williams and Peace from the courtroom as an alternative to closing the court to all spectators except the media." *Drummond*, 111 Ohio St. 3d at 54 (Moyer, C.J., dissenting) (citing *State v. Sanders*, 130 Ohio App. 3d 92, 98 (1998) (trial court erred by failing to consider alternative of identifying spectators responsible for disturbances and expelling them)). This Court could find nothing in the record to indicate that the trial court considered and then rejected this other evident alternative.

In sum, the record is devoid of any indication that the trial court considered alternatives when ordering the closure. Because the Ohio Supreme Court acknowledged this deficiency, it was an unreasonable application of *Waller* for it to hold that the requirement of considering alternatives was met.

### iv.    Adequate Findings

Finally, the Ohio Supreme Court held that the trial court made adequate findings to support the partial closure, as required by the fourth prong of *Waller*. *Drummond*, 111 Ohio St. 3d at 23. Specifically, the Supreme Court found that:

> the trial court stated there had been a physical altercation between spectators and courtroom deputies. The trial court also mentioned that another incident had occurred in the judge's chambers and that witnesses had expressed fear of retaliation by testifying in open court. The trial court also identified Damian Williams and Michael Peace as involved in earlier disturbances.

*Id*. The Ohio Supreme Court further stated that, while additional findings should have been made to justify the partial closure, "the strength of the judge's actual findings must be evaluated in

47

reference to the limited scope of the closure." *Id.* The court found that, based upon the scope of the closure, the trial judge's findings, and information gleaned from the record, "the trial court's findings were adequate." *Id.* (citations omitted). In other words, the Ohio Supreme Court held that the trial court's broad and vague findings were sufficient because it believed the closure was limited.

This Court disagrees with the characterization of the closure as "limited." As noted above and as explained more fully in the discussion of Ground Two, the witnesses were important to the prosecution's case; the entire public was excluded, including Drummond's family; and there is no evidence in the record that the media was present for the entire duration of the closure or that it made any reports about what occurred during the closure. Under such circumstances, this Court simply cannot say that the closure on February 4, while partial, was also limited. But even if it was limited, the trial court was nonetheless required, under *Waller*, to make specific factual findings to justify the closure.

Habeas courts, relying on *Waller*, repeatedly find the Sixth Amendment violated where the trial court failed to articulate specific, reviewable findings to justify a partial courtroom closure. *E.g., Judd*, 250 F.3d at 1318 (affirming grant of habeas relief where motion for courtroom closure took place off record, in part because there were no reviewable findings of trial court justifying closure); *English*, 164 F.3d at 109 (affirming grant of habeas relief where "trial judge failed to use the colloquy to arrive at meaningful findings adequate to justify the exclusion of [the accused's] family"); *Guzman,* 80 F.3d at 776 (reversing and granting habeas relief in part because there was "no finding that the mere presence of [the four persons excluded from the trial] would instill fear in the witness"); *Davis*, 890 F.2d at 1112 (affirming grant of habeas relief because "trial court improperly violated [petitioner's] Sixth Amendment right to a

48

public trial by failing to articulate specific, reviewable findings"); *Mason v. Schriver*, 14 F. Supp. 2d 321, 325 (S.D.N.Y. 1998) (granting habeas relief because the trial court's "conclusory statement is plainly insufficient under *Press-Enterprise I, Waller,* and their progeny as it falls far short of the 'explicit' and 'specific' recorded findings necessary to support closure"); *accord United States v. Galloway*, 937 F.2d 542 (10th Cir. 1991) (remanding to trial court to making factual findings supporting closure and noting that, if case had proceeded on habeas review, the proper remedy would be reversal of conviction); *United States v. Doe*, 63 F.3d 121 (2d Cir. 1995) (remanding to trial court to make factual findings supporting closure).

The dissent in *Drummond* properly characterized the findings of the trial court:

> Here, the record contains little information to aid a reviewing court in determining whether the trial court's order was reasonable and necessary. The trial court's judgment entry states that the prosecution moved to close the courtroom, but the record does not include the prosecution's evidence or arguments supporting its position. These matters may have been considered by the court during a sidebar discussion, but no such discussions were included in the record, as *Waller* requires.

*Drummond*, 111 Ohio St. 3d at 55 (Moyer, C.J., dissenting) (citing *State v. Morris*, 157 Ohio App. 3d 395 (2004)). Indeed, the only "findings" articulated by the trial court, *i.e.,* witnesses or jurors' fear and the disturbances on February 3, as explained above, are not sufficiently detailed to illuminate meaningful review as to why the closure was necessitated on February 4 during Rozenblad's cross-examination and Thomas's and Morris's entire examinations. These articulated findings alone simply do not satisfy the fourth part of the *Waller* test, and it was unreasonable for the Ohio Supreme Court to hold that this part was met.

Here, as described above in relation to other parts of the *Waller* test, this Court's review of the trial record revealed: (1) no witness testified as to any specific threat; (2) the only potential juror who felt threatened by Drummond was dismissed for cause during jury selection;

49

(3) Michael Peace and Damian Williams caused disturbances on February 3, but nothing in the record suggests they were specifically excluded from attending the trial on the morning of February 4; and (4) nothing in the record suggests that there were any disturbances in the courtroom on the morning of February 4. Taken together, this Court finds nothing in the trial record that the Ohio Supreme Court may have relied upon to supplement the trial court's findings that would justify the closure.

Accordingly, this Court finds it was unreasonable, under *Waller*, for the Ohio Supreme Court to have found that the trial court set forth reviewable findings justifying the closure and met the fourth part of the test.

### v.      Conclusion

For the reasons discussed above, this Court finds that the trial court's partial closure of the courtroom on February 4 resulted in structural error and, therefore, Drummond's Sixth Amendment right to a public trial was violated. Accordingly, Drummond's first ground for relief is granted in part.

## B.      Second Ground for Relief -- Confrontation Violation

Drummond asserts that his Sixth Amendment Confrontation right was violated when the trial court limited the scope of defense counsel's cross-examination of three State witnesses. Drummond raised this issue on direct appeal to the Ohio Supreme Court and, therefore, this Court may review this ground for relief on the merits.

### 1.      Pertinent Facts

During trial, the court denied defense counsel's request to question Morris, Thomas, and Rozenblad regarding prior or pending criminal charges. Defense counsel sought to introduce evidence that Morris had been charged, but not convicted, of escape in Columbus.

50

Defense counsel proffered that he was entitled to cross-examine Morris regarding the escape charge, reasoning as follows:

> [Defense counsel] Mr. Gentile: The witness initially said that he did not feel that he was facing so much time [for another charge] while he was in the county jail.
>
> The Court: Right.
>
> Mr. Gentile: I thought at that point I would be able to bring out the fact that he was facing a felony 2 escape from Columbus.
>
> The Court: Okay.
>
> Mr. Gentile: And that would then make him more concerned that he could be facing eight years instead of the few years because he had already made his deal on the cocaine case where he pled to a felony 4. They dismissed the gun spec and he high-tailed it out of there.

(ECF No. 35, Trial Tr., Vol. 14, at 3036-37.)

When the trial court questioned the relevance of the escape charge in Columbus to Drummond's capital case in Mahoning County, defense counsel responded:

> Mr. Gentile: It goes -- any evidence goes to his bias or motive to pleasing the State of Ohio irregardless of what county it's in.
> * * *
> Plus it goes to the fact that this gentleman knows the system.  He knows how to get himself out of deals.
> * * *
> He has written letters to judges. He has done everything under the sun in order to get out of jail.

(*Id.* at 3037.) Thereafter, the trial court ruled that defense counsel could not cross-examine Morris on the Columbus escape charge but counsel could cross-examine him regarding a previous conviction for false reports. (*Id.* at 3041-42.)

Defense counsel also sought to cross-examine Thomas regarding a 1992 drug charge that remained pending during the time of trial. The State proffered that, because of the age of the charge and the consequent lack of evidence, it was going to dismiss the charge. The

51

trial court questioned both Thomas and his attorney, Michael Rich, about whether the State had made any promises to Thomas in exchange for his testimony. Both responded that the State had made no promises in exchange for Thomas's testimony against Drummond. Thereafter, the trial court ruled that defense counsel could not use the drug charge pending against Thomas during cross-examination. (ECF No. 35, Trial Tr., Vol. 14, at 3121-27; Vol. 17, at 3676-83.)

Finally, Drummond argues that the trial court erred when it prohibited defense counsel from cross-examining Rozenblad regarding pending marijuana trafficking charges. Defense counsel sought to cross-examine Rozenblad to ascertain whether the pending charges had induced him to testify for the State. Counsel argued as follows:

> [Defense counsel] Mr. Yarwood:  [. . .]  The point is he has potential criminal charges pending, he cooperates with the State, he may expect that one of those counts may be dismissed, one of them may be amended. It doesn't matter if it happens. It's a bias as to why, why he may have a motive to come in here and make them happy - -
> * * *
> I'm just saying that we're saying his continued cooperation. In his mind he may think I favor this side so I better be good because I'm going to get whacked on these charges. That's bias, any reason that he might tailor his testimony.

(*Id.* at 2958-59; 2959-60.) The trial court responded that it would not permit cross-examination on the pending charges because it had no proof before it that Rozenblad actually had been indicted. (*Id.* at 2960.)

## 2. Ohio Supreme Court's Opinion

Addressing this issue, the Ohio Supreme Court held that the trial court did not abuse its discretion in prohibiting defense counsel from questioning Thomas and Morris about pending criminal charges. Although it found that the trial court erred in ruling that counsel could not cross-examine Rozenblad regarding his pending criminal charges, it determined that the error was harmless. It reasoned as follows:

52

[. . .] Drummond argues that the trial court's ruling prohibiting cross-examination on the pending charges of the three witnesses violated Evid.R. 616(A), which provides: "Bias, prejudice, interest, or any motive to misrepresent may be shown to impeach the witness either by examination of the witness or by extrinsic evidence."

The pendency of charges in another case or the witness's plea arrangement with the prosecutor is admissible to prove the bias of the witness. *State v. Brooks* (1996), 75 Ohio St.3d 148, 152; *State v. Hector* (1969), 19 Ohio St.2d 167, paragraph five of the syllabus (predates evidentiary rules); see 1 McCormick, Evidence (5th Ed.1999) 147, Section 39 (bias includes evidence that "an indictment is pending against [the witness], the witness has not been charged with a crime, has been promised leniency, * * * [or] is awaiting sentence"); *see, also*, Giannelli & Snyder, Evidence (2d Ed.2001) 562, Section 616.3. In *Hector*, we recognized, "[T]he testimony of [a prosecution] witness is or may be influenced by the expectation or hope that, by aiding in the conviction of the defendant, he might be * * * rewarded by leniency in the disposition of his own case." 19 Ohio St.2d at 178.

The trial court did not abuse its discretion by not permitting the defense to cross-examine Thomas about his pending drug charges. *State v. Webb* (Dec. 8, 1999), Summit App. No. 19318, 1999 WL 1215163, *1 (the trial court exercises broad discretion in the admission and exclusion of evidence under Evid.R. 616). The defense had been informed before Drummond's trial that the charges against Thomas would eventually be dismissed because of the age of the charges and the lack of evidence. There was no evidence that Thomas was offered a plea bargain or any other inducement to testify. Thus, the pending drug charges were not relevant in proving his bias in testifying against Drummond. *See State v. Gavin* (1977), 51 Ohio App.2d 49, 54 ("a stale charge is irrelevant to credibility because the element of pressure is not there").

The trial court also did not abuse its discretion by not allowing the defense to cross-examine Morris about the escape charge because those charges had already been dismissed. Thus, cross-examination about the dismissed charges would not have shown bias.

The trial court should have permitted the defense to cross-examine Rozenblad about his pending charges, however. Rozenblad had been charged with trafficking in marijuana, and an indictment was pending on the charges. Rozenblad said that no deals had been reached in exchange for his testimony and that he did not expect to receive a benefit on the charges if he testified against Drummond.  Nevertheless, if the defense had been permitted the opportunity to question Rozenblad about the pending charges, the jury could have tested his credibility. *See State v. Durant*, 159 Ohio App.3d 208 ¶ 34 ("Prejudice ensues

53

from a *denial of the opportunity* to place the witness in his proper setting and put the weight of his testimony and his credibility to a test * * *" [Emphasis sic]).

Nonetheless, we hold that any error in denying cross-examination of Rozenblad was harmless. The trial court allowed counsel to fully cross-examine Rozenblad about all aspects of his activities on the night of the murders. Rozenblad admitted that over a period of five hours on March 24, he had taken six Valium and had drunk six beers. He acknowledged during cross-examination that he did not get along with Drummond, although he had been friends with Brett Schroeder. Thus, the jury knew that Rozenblad's perceptions on the night of the murder were affected by his drug and alcohol use. The jury also knew of motivations that might have influenced his testimony. *See Brooks*, 75 Ohio St.3d at 152 (Evid.R. 616 violation resulted in harmless error where other concrete examples of the witness's truthfulness, or lack thereof, and motivations that might have influenced his testimony were presented to the jury).

Based on the foregoing, we overrule proposition II.

*Drummond*, 111 Ohio St. 3d at 30-31 (parallel citations omitted).

### 3.      Applicable Law

The Sixth Amendment affords a criminal defendant "the right [. . .] to be confronted with the witnesses against him." U.S. Const. Amend. VI. As the Sixth Circuit recently acknowledged, "[t]his right is incorporated against the states through the Due Process Clause of the Fourteenth Amendment." *Miller v. Stovall*, – F.3d – , 2010 WL 2499654, at *2 (6th Cir. June 22, 2010) (citing *Pointer v. Texas*, 380 U.S. 400, 406 (1965)).

Because cross-examination is a powerful defense tool used to undercut the credibility of a state witness, the right to confront a witness includes the right to cross-examine him or her regarding possible biases. Permitting defense counsel to cross-examine a state witness about prior convictions "afford[s] the jury a basis to infer that the witness's character is such that he would be less likely than the average trustworthy citizen to be truthful in his testimony." *Davis v. Alaska*, 415 U.S. 308, 316 (1974).

A trial court has the authority to limit the scope of cross-examination for purposes of curtailing harassment, prejudice, or confusion. *Miskel v. Karnes*, 397 F.3d 446, 452 (6th Cir. 2005). The extent (or limitation) of cross-examination is within the sound discretion of the trial court. *Alford v. United States*, 282 U.S. 687, 694 (1931). When a trial court merely limits the extent of cross-examination, rather than barring it altogether, the trial court is afforded wider latitude. *Dorsey v. Parke*, 872 F.2d 163, 167 (6th Cir. 1989). In these circumstances, the test is "whether the jury had enough information, despite the limits placed on otherwise permitted cross-examination, to assess the defense theory." *Id.* (citations omitted). The impetus for this test is to permit the defense to "'plac[e] before the jury facts from which bias, prejudice or lack of credibility of a prosecution witness might be inferred[.]'" *Id.* (quoting *United States v. Garrett*, 542 F.2d 23, 25 (6th Cir. 1976)). Where a trial court limits the cross-examination of the government's "star" witness, a reviewing court must analyze the claim with heightened scrutiny. *Dorsey*, 872 F.2d at 166.

In *Delaware v. Van Arsdall*, 475 U.S. 673 (1986), the Supreme Court held that, when a reviewing court determines that a trial court unconstitutionally limited the scope of a defense cross-examination, it should apply the harmless error test articulated in *Chapman v. California*, 386 U.S. 18 (1967). The Court in *Van Arsdall* advised:

> Whether such an error is harmless in a particular case depends upon a host of factors, all readily accessible to reviewing courts. These factors include the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.

*Id.* at 684 (citations omitted).

Pursuant to the standard set forth above, this Court must now decide whether the Ohio Supreme Court's opinion was clearly contrary to or an unreasonable application of *Davis v. Alaska* and *Delaware v. Van Arsdall*, the relevant United States Supreme Court precedent.

### 4.     Legal Analysis

#### a.     Morris and Thomas Cross-examination

The Ohio Supreme Court did not contradict or unreasonably apply Supreme Court precedent when it reviewed the Morris and Thomas cross-examinations. As it observed, the charges against Morris already had been dropped by the time he testified. Thus, there was no incentive for Morris to curry favor with the State by altering his testimony. Similarly, the charges against Thomas were twelve years old at the time of trial and the parties were aware that the prosecution intended to dismiss them because the evidence supporting them had disappeared. On these grounds, the Ohio Supreme Court determined that the trial court did not abuse its discretion by prohibiting defense counsel from cross-examining on these charges.

This decision was a reasonable one. The purpose of defense counsel's ability to cross-examine state witnesses about pending criminal charges is to uncover any possible motivations the witness might have to testify favorably for the state. Here, Morris's charges already were dismissed and the charges against Thomas were going to be dropped because of their age. Neither Morris nor Thomas had any incentive to alter their testimony. Thus, the Ohio Supreme Court's ruling that the trial court had authority to limit this aspect of defense counsel's cross-examination was not unreasonable.

#### b.     Rozenblad Cross-examination

On direct appeal, the Ohio Supreme Court held that the trial court should have permitted counsel to cross-examine Rozenblad regarding the pending drug charges because, "if

56

the defense had been permitted the opportunity to question Rozenblad about the pending charges, the jury could have tested his credibility." *Drummond*, 111 Ohio St. 3d at 31. The Ohio Supreme Court thereafter held that any error was harmless because defense counsel questioned Rozenblad about the events on the night of the murder, elicited that he had consumed large quantities of drugs and alcohol on that evening, along with the fact that he disliked Drummond. Counsel also elicited that Rozenblad was, like Drummond, friends with Schroeder and thus had the identical motive to shoot at the Rutledge Avenue home as Drummond.

When reviewing the Ohio Supreme Court's harmless error analysis with the *Van Arsdall* factors, it appears that the court addressed only one of the factors, *i.e.*, the extent of cross-examination otherwise permitted. The court did not comment on the importance of Rozenblad's testimony to the State's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting Rozenblad's testimony, or the overall strength of the State's case.

When a state court does not assess the merits of a petitioner's habeas claim, the deference due under AEDPA does not apply. In such a case, the habeas court is not limited to deciding whether that court's decision was contrary to or involved an unreasonable application of clearly established federal law, but rather conducts a *de novo* review of the claim. *Morales*, 507 F.3d at 930 (citations omitted); *Newton*, 349 F.3d at 878; *Maples*, 340 F.3d at 436-37. If the state court conducts a harmless error analysis but does not indicate whether its finding is based on state or federal constitutional law, however, a habeas court, while conducting an independent review of the facts and applicable law, must nonetheless determine "whether the state court result is contrary to or unreasonably applies clearly established federal law." *Maldonado*, 416 F.3d at 476 (citing *Harris v. Stovall*, 212 F.3d at 943).

57

Because the Ohio Supreme Court did not address the remaining factors of the *Van Arsdall* test, this Court presumes, based on the above precedent, that it must conduct a *de novo* review of them and determine whether the Ohio Supreme Court's result was unreasonable.

### i.        Importance of Rozenblad's Testimony/Cumulative Testimony

In the Traverse, Drummond argues that Rozenblad's testimony was essential to the State's case. He maintains that Rozenblad established Drummond's presence at the party on Duncan Lane in which he overheard Drummond, Gilliam, and one other individual talking about a newcomer to the neighborhood who may have been involved in Schroeder's death. Drummond notes that it was Rozenblad who connected Drummond to the Lincoln Knolls Crips gang and who had connected Drummond to Schroeder. Rozenblad also testified that he saw Drummond with a gun at the party.

Respondent counters that Rozenblad's testimony was cumulative of other witnesses, thereby diminishing its importance. He asserts that other witnesses testified regarding Drummond's gang activity, his connection to Schroeder, his presence at the party, and his possession of a gun while there. In fact, other witnesses did testify about Drummond's gang involvement. Thomas testified that he knew that Drummond was a member of the Lincoln Knolls Crips. (ECF No. 35, Trial Tr., Vol. 14, at 3079-80.) Sergeant Michael Lambert of the Youngstown Police Department's Gang Unit also testified that Drummond's picture and name were in a book partially devoted to Schroeder.[14] (*Id*., Vol. 15, at 3144, 3146.) Thomas and his neighbor, William Greer, also testified that they observed Drummond with a gun while at the party.  (*See, e.g., id*., Vol. 14, at 3071; *see also*, *id*., Vol. 13, at 2663) (testimony of William

---

[14] During the trial, the State introduced a book that was in Drummond's possession. One section was a tribute to members of the Lincoln Knolls Crips who had been murdered, including Schroeder.

Greer, "Q: He had something on his side? What does he have on his side? A: A gun."). Thus, Rozenblad's testimony was largely cumulative of the testimony of Thomas, Sgt. Lambert, and Greer, lessening its significance to the State's case. In contrast, however, Rozenblad was the only witness who testified that he heard Drummond talking at the party that someone who "could have had something to do with the death of Brett Schroeder" had moved into the neighborhood. (ECF No. 35, Trial Tr., Vol. 14, at 2934-35). To that extent, Rozenblad's testimony was not cumulative and was important to the State's case. This factor, therefore, weighs neither for nor against a finding of harmless error.

### ii. Presence or Absence of Corroborating or Contradicting Testimony

Rozenblad's testimony was also cumulative and corroborative of the testimony of other State witnesses. Similar to Rozenblad's testimony, Williams testified that he saw Drummond get in the passenger side of Gilliam's car driving towards the Dent home. (*Id.*, Vol. 13, at 2706.) On direct examination, Thomas testified that, while at the party, he observed Drummond and Gilliam whispering shortly before the shooting occurred:

> Q:  Let's talk a little bit about you hearing whispering and Mr. Drummond saying it's on.
>
> A:  Right.
>
> Q:  You tried to answer Mr. Gentile and you kind of got cut off a little bit. Tell me what - - do you see the whispering?
>
> A:  Yeah, I seen him like, you know, go to him and whisper.
>
> Q:  Tell me who does what?
>
> A:  Wayne goes up to John.  But it's on, it's like something you say out there. Like I'm about to come and pick you up or something.  All right, it's on. Or come over my house and so and so, all right, it's on.  That's just how we say it out there.

(*Id.*, Vol. 14, at 3101-02.) Chauncey Walker, a fellow inmate of Drummond's, also provided corroborating testimony when he stated that Drummond had told him that he shot into the Dent home because he believed Dent was involved in Schroeder's death. (*Id.*, Vol. 15, at 3196.)

The defense did present contradictory testimony from Elisa Rodriguez, who identified another individual, rather than Drummond, as the shooter at the Dent home. In fact, she affirmatively stated that Drummond was not at the crime scene. (*Id.*, Vol. 16, at 3449.) This latter testimony was certainly available for consideration by the jury. Thus, this factor weighs in favor of a finding of harmless error.

### iii.      Strength of Prosecution's Case

Although the State had a solid case, it was not unassailable. Several witnesses testified regarding Drummond's motive, his gang involvement and association with Schroeder, as well as his whereabouts on the night of the murder. While the State presented ballistic evidence that the bullets shot into the Dent home were compatible with a weapon Drummond reportedly carried on the night of the murder, it never actually recovered the murder weapon. Moreover, the closest eyewitness to the shooting, Elisa Rodriguez, testified that she did not see Drummond, but saw another individual at the scene. Thus, this factor weighs neither for nor against a finding of harmless error.

### iv.      Extent of Cross-examination Otherwise Permitted

As described above, the Ohio Supreme Court applied the final *Van Arsdall* factor in finding the error harmless. The court found that, because Rozenblad was cross-examined about his extensive alcohol and drug use on the night of the murder, his dislike of Drummond, and his friendship with Brett Schroeder, the jury was aware of factors other than the pending drug charges that may have similarly biased Rozenblad's testimony. *See Drummond*, 111 Ohio

60

St. 3d at 31. This Court holds that the Ohio Supreme Court's implicit determination that this factor weighs in favor of finding a harmless error was not unreasonable.

### 5.    Conclusion

Having conducted a *de novo* review of the *Van Arsdall* factors that the State court omitted, this Court ultimately concludes that the Ohio Supreme Court's finding that the error was harmless was not unreasonable. Although Drummond claims that Rozenblad was the key witness who "anchored for the State the motive attributed to Drummond," that conclusion is not clearly reflected in the trial transcripts. (ECF No. 57 at 39.) While Rozenblad certainly was an important witness for the State because he testified that he overheard Drummond talking at the party about a newcomer to the neighborhood who might have had something to do with Schroeder's death, the testimony of others was also important to the State's case and corroborative of much of Rozenblad's other testimony.

Finally, although Drummond decries in the Traverse that the defense theory included that Rozenblad was a viable suspect in the murder because he had the same motive as Drummond, the Respondent astutely observes that the defense was not prohibited from developing this theory merely because the trial court curtailed counsel's ability to cross-examine him on pending drug charges.

While information about Rozenblad's pending criminal charges may have been helpful to the jury in assessing Rozenblad's credibility, when weighing all the factors, this Court agrees with the Ohio Supreme Court's conclusion that any error in restricting the cross-examination was harmless, particularly given Rozenblad's admission on cross-examination that he did not like Drummond and had been friends with Schroeder. Accordingly, the Ohio Supreme

Court's disposition of the issue was not contrary to nor an unreasonable application of *Van Arsdall*. As such, Drummond's second ground for relief is not well-taken.

**C.     Third Ground for Relief -- Trial Violated Due Process**

In this ground, Drummond contends that the trial court erred when it admitted gang and weapon evidence during trial. In the Traverse, Drummond concedes that he cannot meet the standard required under *Brecht v. Abrahamson*, 507 U.S. 619 (1993), and he withdraws this ground for relief. This Court therefore will not review it.

**D.     Fourth Ground for Relief -- Improper Juror Dismissal Rulings**

Drummond argues that the trial court erred when it retained two venire members and placed them on the jury and excused a third panel member from jury service. The trial court's actions, Drummond maintains, violate his Fifth, Sixth, Eighth, and Fourteenth Amendment rights. In his Return of Writ, Respondent asserts that this claim is procedurally defaulted because Drummond failed to raise it on direct appeal.

In *State v. Perry*, 10 Ohio St. 2d 175 (1967), the Ohio Supreme Court held that a final judgment of conviction bars a convicted defendant from raising and litigating in any proceeding, except an appeal from that judgment, any defense or any claimed lack of due process that was raised *or could have been raised* by the defendant at the trial on the merits, or on appeal from that underlying judgment. *Id.* at 180; *see also State v. Roberts*, 1 Ohio St. 3d 36, 39 (1982) (holding policy behind *Perry* bars post-conviction petitioners from raising issues that could have been raised on direct appeal in a collateral proceeding to avoid reversal of conviction based on collateral, rather than constitutional, issues). Thus, unless a claim is based on evidence *dehors* the record, it must be raised during direct appeal, or be deemed waived.

In his Traverse, Drummond concedes that this claim is based on evidence contained within the trial record and is therefore procedurally defaulted under the *Perry* doctrine. Furthermore, Drummond does not assert cause and prejudice to excuse the procedural default.

Accordingly, the Court finds this claim to be procedurally defaulted and will not review it on the merits.[15]

## E.    Fifth Ground for Relief -- Actual Innocence - Sufficiency of the Evidence

In Drummond's fifth ground for relief he asserts that the evidence the State presented during trial is insufficient to support his conviction.[16] He claims that the State failed in its efforts to identify who fired the fatal shots that killed Jiyen Dent Jr. He also asserts that the State never established the caliber of the fatal bullet. Finally, Drummond argues that Dent Sr. denied ever knowing Schroeder. He concludes that this fact undercuts the State's proffered

---

[15] This claim is without merit in any event. The Supreme Court has held that a habeas court must give much deference to the trial court's determination regarding whether a prospective juror is qualified to serve because it is in the best position to perceive a juror's demeanor. In *Uttecht v. Brown*, 551 U.S. 1 (2007), the Court found that the trial court properly excused for cause a juror who equivocated about his ability to impose the death penalty and who appeared at times confused about the law. Although the Court in *Uttecht* recognized that deference to a trial court "does not foreclose the possibility that a reviewing court may reverse the trial court's decision [to excuse a juror for cause] where the record discloses no basis for a finding of substantial impairment," it held that when "there is lengthy questioning of a prospective juror and the trial court has supervised a diligent and thoughtful *voir dire*, the trial court has broad discretion." *Id.* at 20.

Here, the trial court allowed venire members Martina Frost-Kim and Madeline Kerr to serve on Drummond's jury. Frost-Kim, Drummond alleges, equivocated when asked whether she would hold Drummond's decision not to testify against him. While Frost-Kim did equivocate somewhat, she also recognized that she would "have to take it as though [Drummond] was presumed innocent." (ECF No. 35, Trial Tr., Vol. 9, at 1785.) Drummond also takes issue with Kerr's initial reservations about her willingness to weigh mitigating factors. The trial court noted on the record, however, that venire member Kerr agreed to follow the law but merely became confused when both parties read the statutory mitigating factors to her. (*Id.*, Vol. 4, at 725.) Finally, venire member Beene stated throughout his voir dire that he was uncomfortable imposing a death sentence. (*Id.*, Vol. 8, at 1517; 1525; 1526; 1528; 1534.) The trial court therefore did not abuse its discretion in excusing him.

[16] Drummond also asserts his actual innocence, albeit in cursory fashion. The Court, however, will not conduct an actual innocence analysis. In *Schlup v. Delo*, 513 U.S. 298 (1995), the Supreme Court enunciated the standard by which a federal habeas court should analyze actual innocence claims. It found that, "[t]o be credible, such a claim requires petitioner to support his allegations of constitutional error with new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not presented at trial." *Id.* at 324.  Thus, once a district court determines that the evidence the petitioner proffers during the habeas proceeding is indeed new reliable evidence, the district court then considers the new evidence, along with evidence adduced during trial, in conducting its reasonable juror analysis. Here, Drummond offers no new evidence to support his actual innocence claim.

motive for Drummond to fire into the Dent home. Drummond raised this claim on direct appeal to the Ohio Supreme Court and it is, therefore, ripe for federal habeas review.[17]

In *Jackson v. Virginia*, 443 U.S. 307 (1979), the Supreme Court explained the standard of review a habeas court must employ when reviewing an insufficiency of the evidence claim. It concluded that a court must determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 319 (emphasis in original); *Biros v. Bagley*, 422 F.3d 379, 392 (6th Cir. 2005). In applying *Jackson*, this Court must limit itself to evidence adduced during trial because a "sufficiency of the evidence review authorized by *Jackson* is limited to 'record evidence.' [citation omitted] *Jackson* does not extend to nonrecord evidence, including newly discovered evidence." *Herrera v. Collins*, 506 U.S. 390, 402 (1993) (quoting and citing *Jackson*, 443 U.S. at 318). The *Jackson* standard does apply, however, "whether the evidence of guilt was direct or circumstantial." *Scott v. Elo*, 302 F.3d 598, 602 (6th Cir. 2002) (citing *Spalla v. Foltz*, 788 F.2d 400, 402 (6th Cir. 1986)).

---

[17] Drummond's third sub-claim in ground five is that the State did not prove motive because it failed to prove that Drummond had a connection to Schroeder or that Dent was responsible for Schroeder's murder. (ECF No. 34, App. Vol. 3, at 88-94.) Although this issue does not appear to be raised on direct appeal, Respondent does not assert that it is procedurally defaulted. The Court is not required to engage in a *sua sponte* analysis of procedural default where respondent has declined to raise the issue. "[P]rocedural default is normally a defense that the State is obligated to raise and preserve if it is not to lose the right to assert the defense thereafter." *Trest v. Cain*, 522 U.S. 87, 89 (1997) (internal quotation marks and citations omitted). Thus, a habeas court may forego a procedural default analysis and address the merits of a claim when the respondent fails to raise this defense. *See, e.g., Jamison v. Collins*, 100 F. Supp. 2d 521, 597 (S.D. Ohio 1998) (addressing merits of claim when respondent failed to raise procedural default defense in return of writ or supplement to return of writ). The Court does, however, have discretion to apply this procedural bar *sua sponte* in some circumstances. *See, e.g., Lorraine v. Coyle*, 291 F.3d 416, 426 (6th Cir. 2002); *Elzy v. United States*, 205 F.3d 882, 886-87 (6th Cir. 2000). Regardless of the defaulted status of this particular sub-claim, the Court notes that the Ohio Supreme Court amply addressed Drummond's sufficiency claim under Supreme Court precedent, as described in the Court's analysis of this ground for relief.

On direct appeal, the Ohio Supreme Court reviewed the evidence the State presented during trial and found that Drummond could not support his insufficiency claims. After citing *Jackson* and its Ohio analog, it held:

> [. . .] First, [Drummond] asserts that the evidence fails to establish that he fired a weapon on the night of the murder. However, several witnesses saw Drummond with an assault rifle then. He and Gilliam were also seen driving toward the Dent home just before the shots were fired. Drummond himself admitted to Walker that he had fired the shots into the Dent home that night, and Morris overheard his admissions to Walker.
>
> Drummond emphasizes Elisa Rodriguez's testimony that she saw Gilliam firing a weapon towards the Dent home but did not see Drummond in the area when the shots were fired. Rodriguez said that she then saw Gilliam get into his car alone and flee the scene. She also said that she saw Jawany running down Rutledge Drive, shooting a gun and saw him fire his last gunshot in front of the Dent home. Rodriguez's testimony, however, is contradicted by testimony that Drummond and Gilliam went to Schroeder's home after the shooting and by evidence that six 9 mm shots were fired towards the Dent home from the corner of Rutledge Drive and Duncan Lane. No evidence was presented that a person running down the street fired additional shots towards the Dent home.
>
> Second, Drummond argues that the person shooting the 9 mm weapon might have killed Jiyen because no evidence was presented proving the caliber of the bullet that killed him. However, expert testimony established that only one 9 mm bullet hit the Dent home, and this slug was recovered from the kitchen wall inside the house. The baby was in the living room, not the kitchen, when the shots were fired. Thus, Jiyen was not killed by a 9 mm bullet, but by a shot fired from the assault rifle into the Dent home.

*Drummond*, 111 Ohio St. 3d at 39-40.

The Ohio Supreme Court correctly identified *Jackson* as the prevailing standard by which to review Drummond's claim. It recited the evidence the State presented, such as the witnesses who placed Drummond near the Dent home before the shots were fired and the ballistics expert who testified that the fatal shot must have been fired by an assault rifle. The court then concluded that the evidence the State presented was sufficient to support a conviction for aggravated murder. The Ohio Supreme Court did not unreasonably apply *Jackson* and

65

supported its findings adequately with testimony from the trial. Accordingly, this ground for relief is not well-taken.

**F.        Sixth Ground for Relief -- Manifested Judicial Bias**

Drummond claims in this ground for relief that the trial judge was biased or erred in several respects. First, he asserts that the trial court erred when it presided over both his trial and co-defendant Gilliam's trial. Drummond also claims that the trial court failed to require that several sidebar conferences be placed on the record. He maintains that the trial judge made inappropriate comments regarding witnesses and defense counsel during trial. Drummond argues that the trial court did not rule on the defense's objections during the State's closing argument. He also claims the trial court erred when it denied his request for new counsel, denied his motion for a change of venue, overruled counsel's objections regarding prosecutorial misconduct, and questioned whether Drummond was truly remorseful over killing a baby.

Respondent asserts that all of the sub-claims Drummond raises here are procedurally defaulted because Drummond never raised them on direct appeal. Drummond raised one of these sub-claims (trial judge presiding over co-defendant's trial) in his post-conviction petition and others in his application to reopen his direct appeal.

This Court finds Drummond's many sub-claims to be procedurally defaulted on various grounds. First, as Respondent notes, these claims are contained in the trial record and, pursuant to *State v. Perry*, 10 Ohio St. 2d 175 (1967), could have been raised on direct appeal. Moreover, the sub-claims raised as part of Drummond's application to reopen direct appeal were raised as part of an ineffective assistance of appellate counsel claim. The Sixth Circuit has held that to exhaust a claim, a petitioner must present it to the state under the same theory in which it is later presented in federal court. *See Hicks v. Straub*, 377 F.3d 538, 552-53 (6th Cir. 2004)

(holding that "the exhaustion doctrine requires the petitioner to present 'the same claim under the same theory' to the state courts before raising it on federal habeas review") (quoting *Pillette v. Foltz*, 824 F.2d 494, 497 (6th Cir. 1987)); *Wong v. Money*, 142 F.3d 313, 322 (6th Cir. 1998). This Court finds that these sub-claims are procedurally defaulted because they were not presented to the Ohio courts under the same theory as they are raised in the Amended Petition. Accordingly, this Court will not review these sub-claims on the merits.[18]

---

[18] Were they ripe for habeas review, none of the claims Drummond raises would warrant habeas relief. While due process requires that a trial be unfettered by actual judicial bias or the appearance of it, "disqualification of a judge for bias or prejudice is 'constitutionally required' only in the 'most extreme cases.'" *Moore v. Mitchell*, 531 F. Supp. 2d 845, 875 (S.D. Ohio 2008) (quoting *Aetna Life Ins. v. Lavoie*, 475 U.S. 813, 821 (1986)). The Supreme Court recently explained this precept in *Caperton v. A.T. Massey Coal Co.*, – U.S. –, 129 S. Ct. 2252 (2009). There, the Court held that a newly elected state supreme court judge had violated due process when he presided over a case in which one party had contributed substantially to the judge's election campaign. While the Court in *Caperton* confirmed the general principle that most judicial disqualification issues do not rise to a constitutional level, it cautioned that the Constitution would require judicial disqualification in instances where the "probability of actual bias on the part of the judge or decisionmaker is too high [. . .]." *Id.* at 2259 (internal quotation omitted). After conducting an "objective inquiry" into whether the party's contributions would offer a possible temptation to the average judge, the Court held that the amount and temporal proximity of the campaign contribution to the judge presiding over the case constitutionally required the judge's recusal. *Id.* at 2264-65.

Although *Caperton* is instructive because it provides the Court with the most recent standard of review, the factual dissimilarities between *Caperton* and the instant case negate its applicability here. Instead, the Court finds that *Gillard v. Mitchell*, 445 F.3d 883 (6th Cir. 2006), offers the Court greater guidance. In that case, the petitioner asserted that the trial court was biased and partial because it had presided over an *ex parte* hearing during which the court heard testimony regarding the petitioner's background. *Id.* at 892. It observed that the Supreme Court of Ohio had held that, while the trial court erred in refusing to recuse itself, the error was harmless because of the overwhelming evidence of the petitioner's guilt. *Id.* at 893. Citing a previous case in which it had utilized the harmless error standard of review to adjudicate a judicial bias claim, the court in *Gillard* accepted the Ohio Supreme Court's findings. *Id.* (citing *Esparza v. Mitchell*, 310 F.3d 414, 424 (6th Cir. 2002), *rev'd on other grounds*, 540 U.S. 12 (2003)). Additionally, the court noted that the petitioner could not demonstrate the trial court's actual bias. *Id.* It therefore found the petitioner's claim had no merit.

Drummond alleges here that the trial court was biased and erred in several respects, as noted above. None of these assertions, however, would withstand a harmless error review. First, the fact that the trial court presided over both Drummond's and Gilliam's trial does not constitute unconstitutional bias. Although Drummond contends that the trial court made disparaging comments about Gilliam, he cannot demonstrate that this led to any actual bias against Drummond. Moreover, the trial court's failure to record sidebar conferences and alleged inappropriate comments, if erroneous, are harmless given the evidence the State presented of Drummond's guilt. Drummond's complaints that the trial court did not rule on the defense's objections during the State's closing argument, that he was denied a request for new counsel after the trial court spoke with Drummond, denied his motion for a change of venue, and overruled counsel's objections regarding prosecutorial misconduct do not constitute evidence of bias or error, but are merely instances in which the trial court ruled against Drummond.

G.      **Seventh Ground for Relief -- Culpability Phase Ineffective Assistance of Counsel**

In this ground for relief, Drummond alleges several instances in which defense counsel was ineffective during the culpability phase of his trial. Specifically, he asserts that counsel was constitutionally ineffective when they failed to:

1.      Use a Bureau of Criminal Investigations ("BCI") report to clarify whether the murder weapon was an assault-type weapon;

2.      Inquire why bolt-action rifles were listed as possible source weapons;

3.      Assert a second shooter theory through cross-examination;

4.      Investigate evidence, including a BCI report that cast doubt over the shooter;

5.      Interview co-defendant Gilliam;

6.      Investigate or properly cross-examine the Greers;

7.      Object to:

    a.      two State witnesses,

    b.      the playing of a 9-1-1 tape recording;

    c.      the lack of recording of all sidebars;

    d.      inappropriate conduct by the trial court and the prosecutor; and

    e.      portions of Walker's testimony;

8.      Hire a private investigator earlier in the trial proceedings; and

9.      Take an active role in the trial.

(ECF No. 45, at 53-67.)

To succeed on an ineffective assistance of counsel claim, a petitioner must satisfy the familiar two-prong test for ineffective assistance of counsel set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). First, the petitioner must demonstrate that counsel's errors

68

were so egregious that "counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687. To determine if counsel's performance was "deficient" pursuant to *Strickland*, a reviewing court must find that the representation "falls 'below an objective standard of reasonableness.'" *Murphy v. Ohio*, 551 F.3d 485, 496 (6th Cir. 2009) (quoting *Strickland*, 466 U.S. at 688).

Second, the petitioner also must demonstrate that he or she was prejudiced by counsel's errors. "This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687. A petitioner must point to "specific errors" in counsel's performance. *United States v. Cronic*, 466 U.S. 648, 666 (1984). Thereafter, a reviewing court must subject the allegations to rigorous scrutiny, determining "whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. A reviewing court must strongly presume that counsel's conduct was reasonable and might be part of a trial strategy. *Id.* at 689. "'Judicial scrutiny of a counsel's performance must be highly deferential' and [. . .] 'every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.'" *Bell v. Cone*, 535 U.S. 685, 698 (2002) (quoting *Strickland*, 466 U.S. at 689; second alteration in original).

If a petitioner "fails to prove either deficiency or prejudice, then [the] ineffective assistance of counsel claims must fail." *Lundgren v. Mitchell*, 440 F.3d 754, 770 (6th Cir. 2006) (citing *Strickland*, 466 U.S. at 697).

In his Traverse, Drummond concedes that he cannot meet the *Strickland* standard in several of the sub-claims he raises in the petition. (*See* ECF No. 57, at 67-68.) Drummond

therefore withdrew all sub-claims except trial counsel's failure to request that all sidebar conferences be placed on the record and counsel's failure to object to the improper acts of the trial court and prosecutor. This Court addresses these sub-claims pursuant to *Strickland* and its progeny.

### 1. Sub-claim 7(c): Failure to Record Sidebar Conferences

Drummond contends that counsel were ineffective for failing to request that the trial court record several sidebar conferences during trial.

Rule 22 of the Ohio Rules of Criminal Procedure requires all proceedings to be recorded in all serious offense cases, and Ohio Appellate Rule 9(A) requires, "[i]n all capital cases the trial proceedings shall include a written transcript of the record made during the trial by stenographic means." Ohio App. R. 9(A). When a proceeding has not been preserved, counsel may invoke procedures set forth in Ohio App. R. 9(C) or 9(E) to reconstruct the record. In the absence of an attempt to reconstruct the substance of the remarks and demonstrate prejudice [an] error may be considered waived." *State v. Jells*, 53 Ohio St. 3d 22, 32 (1990) (quoting *State v. Brewer*, 48 Ohio St. 3d 50, 60-61 (1990) and citing *United States v. Gallo*, 763 F.2d 1504, 1529-32 (6th Cir. 1985)).

Drummond's counsel were not ineffective for failing to have all sidebar conferences recorded. Drummond fails to set forth any evidence to support a finding that counsel were ineffective simply because they did not request all sidebar conferences be placed on the record. Other than mere assertion, he does not provide this Court with specific information that would support a claim that he was prejudiced by trial counsel's failure to request these recordings. Moreover, during trial counsel Gentile's habeas deposition, he stated that there were

no sidebar conferences that he had wanted to be on the record that were not.[19] Thus, Drummond cannot demonstrate that any sidebars that were significant were unrecorded. He therefore cannot establish that counsel's failure to act prejudiced the outcome of the culpability phase of trial. This sub-claim is not well-taken.

## 2. Sub-claim 7(d): Failure to Object to Trial Court Errors and Prosecutorial Misconduct

Drummond maintains that counsel were constitutionally ineffective for failing to object to the trial judge's inappropriate behavior and to prosecutorial misconduct. The Court addresses the factual underpinnings of these sub-claims in Drummond's sixth and tenth grounds for relief. Because the Court finds they have no merit, it necessarily follows that Drummond cannot establish the prejudice prong of the *Strickland* test here. *See Lundgren*, 440 F.3d at 770 (citing *Strickland*, 466 U.S. at 697). Accordingly, this sub-claim has no merit.

## H. Eighth Ground for Relief -- Penalty Phase Ineffective Assistance of Counsel

In this ground for relief, Drummond contends that defense counsel were ineffective during the penalty phase of trial for failing to:

1. Use a qualified gang expert;

2. Prepare the expert and present evidence through the expert;

3. Investigate and present evidence regarding Drummond's background;

---

[19] Counsel explained the reason why he did not request the recordings as follows:

> Q:     Now, throughout the trial transcript there's a lot of areas where sidebars are put into the record.  Can you explain why those aren't recorded?
>
> A:     Well, sometimes the Judge, you know, takes a hands-off approach on that. Sometimes, I mean, I know the seminars say that "Every side bar should be recorded."  But sometimes you just can't control that with the judge.
>
> Q:     Was there any sidebars that you're aware of that you wanted on the record that you didn't get on the record?
>
> A:     No.

(ECF No. 55-1, Gentile Dep., at 35-36.)

4.      Investigate Drummond's family;

5.      Present evidence regarding Drummond's leg amputation;

6.      Present evidence regarding Drummond as a parent and object to the prosecutor's improper closing argument regarding Drummond's fitness as a parent; and

7.      Conduct a timely and complete mitigation investigation.

**1.      Procedural Default**

Respondent alleges that sub-claim 1, failure to use a qualified gang expert, is procedurally defaulted because Drummond first raised it in his post-conviction relief proceedings. Drummond counters with four arguments: (a) The Seventh District Court of Appeals addressed the claim on the merits; (b) sub-claim 1 was not presented to the state courts as a separate claim but rather as a part of one, larger ineffective assistance during mitigation claim; (c) the Seventh District Court of Appeals erroneously held that Drummond could have raised this claim on direct appeal; and (d) ineffective assistance of appellate counsel constitutes cause and prejudice to excuse the default. This Court finds sub-claim 1 to be procedurally defaulted.

Drummond first asserts that the Seventh District Court of Appeals addressed this sub-claim on the merits. While that court did, in fact, address the merits of counsel's failure to hire a gang expert, it also held that Drummond should have raised this claim on direct appeal. *State v. Drummond*, 2006 WL 3849295, at *10 ("although an affidavit of a gang expert is attached, the fact that the state's case revolved around gang motives and the fact that the psychologist used was not a 'gang expert' was on the record and thus the failure to use a gang expert could have been raised on direct appeal"). The Sixth Circuit held that "[c]ontrolling precedent in our circuit indicates that plain error review does not constitute a waiver of state

72

procedural default rules." *Seymour*, 224 F.3d at 557. Thus, the Seventh District's review of the merits of the claim does not waive its finding of *res judicata*.

Drummond also contends that sub-claim 1 is an inextricable part of his comprehensive ineffective assistance during mitigation claim. This assertion is belied by the fact that Drummond's post-conviction counsel separated this claim from the others in the petition. Although the Seventh District addressed them together in its holding on the merits, that fact alone does not render this sub-claim incapable of separate procedural default review.

In his third argument, Drummond alleges that the Seventh District erred when holding that this sub-claim could have been raised on direct appeal. He contends that any decision regarding whether a gang expert was necessary requires an expert to highlight Dr. Fabian's deficiencies. This information, Drummond asserts, can be developed only through evidence outside the trial record. While this assertion has some merit, the fact that the defense team did not hire a "gang expert"--a fact that Dr. Fabian openly stated during his testimony--was patently clear from the record. Thus, this argument is not well-taken.

Finally, Drummond claims that ineffective assistance of appellate counsel can serve as cause and prejudice to remove the procedural bar. Drummond cannot use ineffective assistance of appellate counsel to excuse the default of this sub-claim because he cannot demonstrate that counsel's actions were unreasonable.

Although finding sub-claim 1 to be procedurally defaulted, in an abundance of caution, the Court will address it on the merits below, along with the other sub-claims that are not defaulted.

### 2.    Relevant Facts

### a.    Factual Findings of the Ohio Supreme Court

In its independent sentence evaluation, the Ohio Supreme Court outlined the testimony Drummond presented during the mitigation hearing:

> Against these aggravating circumstances, we now weigh the mitigating factors contained in R.C. 2929.04(B). Drummond called five mitigation witnesses and made an unsworn statement for the jury's consideration.
>
> Cynthia Drummond, the defendant's mother, testified that Drummond has two brothers, two sisters, and a stepsister. Drummond's mother was divorced from his father when Drummond was 14 years old. Drummond then lived with his father in the family home. However, he did not do well in school and received failing grades. Later, Drummond moved in with his brother.
>
> When Drummond was 16 years old, he was shot five times, and his injuries resulted in the amputation of his leg. Drummond and his mother then returned to the family home. Drummond went through rehabilitation and received a prosthetic leg. He never finished school. Drummond's mother suspected that Drummond and his friends were involved in gang activity, but he denied it. In 2001, Drummond was shot in his other leg. Drummond is also a father of twins. According to his mother, he "loves his kids" and interacts well with them.
>
> John Drummond Sr., the defendant's father, testified that Drummond moved into his home following the loss of his leg. During the past two or three years, father and son have "gotten closer, sort of seeing things on the same lines." His father has also noticed a positive change in Drummond since the birth of his twins, a boy and a girl. The father testified that in interacting with his children, Drummond shows patience and understanding and tries to deal with the children on their level. Drummond's father testified that he loves his son and sees a lot of good in him. Drummond has made some wrong choices, but his father believes that he can communicate his experiences to others and educate them.
>
> Shalise DeMarco is the mother of Drummond's two-year-old twins. DeMarco and Drummond are no longer together, but they remain friends. She also states that Drummond "loves his kids."
>
> Lovely Atkins and Drummond were neighbors in the Lincoln Knolls area. They have known each other for several years, and Atkins considers Drummond a good friend. She says Drummond "was always nice. He looked out for a lot of people to make sure no harm would come" to them. Drummond would often ask Atkins how she was doing in school. He would also tell her, "[A]lways be a good girl. Never get in any mess around here. * * * [K]eep it up, and * * * make sure you do good." Atkins "looked up" to Drummond and took what he told her "to heart."

74

Dr. John Fabian, a clinical psychologist, performed psychological testing and a clinical assessment of Drummond. Fabian found that Drummond is "significantly below average in verbal skills and vocabulary." Results from the Weschler Adult Intelligence Scale showed that Drummond has an IQ of 82. However, Fabian does not believe that Drummond is neurologically impaired, and he has no history of any serious brain trauma. Nevertheless, "overall he is below average in intellectual functioning."

Drummond grew up in the Youngstown area. Although his parents were divorced in 1991, Drummond was raised in a "[p]retty intact home." Drummond's parents seemed involved in his life. His mother attended "parent-teacher conferences, and there was care and support." Moreover, Drummond was never sexually abused or seriously neglected. According to the psychologist, "there was some evidence of whippings, [and] normal spankings," but there was no family history of domestic violence or serious abuse.

Drummond was involved with the Crips from ages 13 to 19. According to Fabian, Drummond "made a choice as an adolescent to run the streets, involve himself in a gang." However, it was a choice based on "peers and social environment, not his family."

While involved with gangs, Drummond witnessed many shootings and experienced other violence. When Drummond was 16, he was shot, and his leg was amputated. In 2001, he was shot twice. However, Drummond claims that he is no longer in a gang.

Dr. Fabian testified that Drummond was "nonchalant" about being shot. "It was not a big deal to him." In explaining Drummond's attitude, Fabian said, "It's the way he lived. It's the way his world was. It's violence. * * * It's losing friends. It's being shot at. It's shoot first, ask questions later. It's that kind of environment that needs to be explained."

Fabian also testified that Drummond has a juvenile record but nothing too serious. He believes that Drummond can adjust well to prison because he has had no violent infractions while in jail during the past year, and is "older." During cross-examination, Fabian acknowledged that Drummond has been in a segregation unit of the jail during the past year and that when Drummond was in jail in 1999, he was involved in a fight with another inmate.

During further cross-examination, Fabian said that Drummond has no history of mental illness. He also reported that Drummond has been convicted of "drug abuse, cocaine."

During a brief unsworn statement, Drummond extended his "condolences to Jiyen and his girlfriend Latoya Butler * * * for the passing away of their son."

75

Drummond also said, "I object to these charges that has been brought against me. I know that you or nobody you hang with had nothing to do with the death of Brett Schroeder. I feel very sad about the passing of Jiyen Dent, Jr. but I did not commit this crime that I have been accused of." In closing, Drummond said, "I ask the jury to have mercy for the crime that I have been accused of."

*Drummond*, 111 Ohio St. 3d at 48-50.

**b.      Dr. Fabian's Mitigation Testimony**

In addition to the facts as set forth above, the Court highlights some additional areas of Dr. Fabian's mitigation testimony during the penalty phase of the trial.

**i.      Trial Testimony Regarding Gangs and Family Background**

On direct examination, defense counsel inquired whether Dr. Fabian had assessed youths with gang involvement. Dr. Fabian responded that he had. He indicated that, as part of the evaluation process, he had encountered some juvenile offenders who had gang involvement. He therefore appeared qualified to discuss gang affiliation. When counsel probed further, querying about the environmental factors in a gang atmosphere, Dr. Fabian responded that he was "not a gang expert."  (ECF No. 35, Trial Tr., Vol. 18, at 3820). Nevertheless, when asked about the reason for Drummond's gang involvement, Dr. Fabian responded that, despite witnessing violence, Drummond did not suffer from post-traumatic stress disorder. He then made the following statements:

The bottom line is that individuals like John and John [sic], he has to develop a way to live, a way to cope. I'm not going to sit up here and lie. John made a choice as an adolescent to run the streets, involve himself in a gang. He made a choice.

(*Id.* at 3825.)

Dr. Fabian further testified that Drummond came from an "intact" home in which his basic needs were met. (*Id.* at 3817.) He stated that Drummond never was abused or subjected

to violence in the home and that his parents were married until 1991. (*Id.*) Dr. Fabian described

Drummond's move to the home of his half-brother Brooks as a result of his father giving him an

ultimatum to give up his gang involvement or get out of the house. Drummond moved back

home to live with his father only after he was shot. (*Id.* at 3819.)

### ii.     Dr. Fabian's Preparedness for Trial Testimony

Dr. Fabian conceded that he was unprepared to testify. When defense counsel

asked him what records he had reviewed to prepare himself, Dr. Fabian responded:

> So I, um, I want to premise this. I didn't have a lot of time to do this evaluation. I
> did the best I could. And I actually got about the most information I could get
> within the time frame, and I think we put together a pretty solid background on
> the records we had.

(*Id.* at 3810.) Thus, without even being asked about how much time he had to conduct his

evaluation, Dr. Fabian offered up testimony that it was insufficient.

### c.     This Court's Evidentiary Hearing

As noted previously, this Court granted Petitioner's request for an evidentiary

hearing with respect to this ground for relief. The hearing was conducted on July 19-20, 2010.[20]

Drummond's habeas counsel set out to show that there was a significant amount

of information about Drummond that his trial counsel had simply failed to discover and present

to the jury due to a combination of poor pre-trial investigation and the complete failure to hire a

"gang expert"--which, it is argued, amounts to ineffective assistance of counsel at the penalty

phase of the trial.

Because the defense mitigation theme turned upon Petitioner's gang activity,

Drummond argues that it was imperative that trial counsel obtain a strong expert on gangs to

---

[20] The Court sets forth herein significant factual detail from the evidentiary hearing for purposes of a complete
record. The two-volume transcript of the hearing is in the record at ECF Nos. 96 and 97.

show the jury (1) how, between the ages of 13 and 16, Drummond's life and family experience had driven him into a gang; (2) how that gang then filled the void in his life caused by his dysfunctional family; and (3) how the gang's influence led him to commit the crimes for which he had been convicted. Drummond argues that, because his trial counsel failed to interview key family members (*e.g.*, his half-brother Michael Brooks and his parents), his life was grossly misrepresented to the jury, who ultimately heard Dr. Fabian, the defense expert during the penalty phase of the trial, testify that Drummond came from an "intact" family and had, essentially, "made a choice" to run the streets.

At the evidentiary hearing before this Court, habeas counsel called Michael Brooks, who testified that he was incarcerated at the time of Drummond's trial and was never contacted by trial counsel. (ECF No. 96, Hr'g Tr., at 12, 14.) He further explained that Drummond came to live with him when Drummond was 14 years old, after having an altercation with his father. (*Id*. at 14, 15-16.) Brooks testified that, during the time Drummond was living in his apartment, Brooks was dealing drugs and was rarely home. In fact, he did not actually live in the same apartment with Drummond, leaving the teenager essentially unsupervised. (*Id*. at 16, 17-18, 20, 33.) It was at this time, according to Brooks, that Drummond became involved with members of the Lincoln Knolls Crips that he knew from the neighborhood. (*Id*. at 21.) Brooks also testified that, when he himself still lived in his parents' home, he was pretty much responsible for everything because both his parents worked and did not give much attention to their children. (*Id*. at 22.) Brooks admitted on cross-examination that he loves his brother very much and does not want him to be executed.

John Drummond Sr., Petitioner's father, testified at the hearing that he never really talked to defense counsel or prepared for his testimony during the penalty phase of the

78

trial. (*Id*. at 197, 199.) He did recall going to Mr. Gentile's office as a family for a pre-trial meeting, but he claims that no one spoke to him specifically at that time. (*Id*. at 198-99.)[21] On cross-examination, he acknowledged that he never spoke to Dr. Fabian and had no idea that he was on the defense team, nor did he ever speak with defense investigator Hrdy. (*Id.* at 208.)

When asked about his relationship with his former wife, Petitioner's mother, Drummond Sr. indicated that she used drugs and had a drinking problem, that she did not get along that well with her sons and did not encourage their education or care what they did in school. (*Id.* at 200, 201.) Drummond Sr. became aware that Drummond Jr. was "running the streets" somewhere around the age of 12 or 13. (*Id*. at 201-02.) He stated that, when he admonished him for getting in trouble at school, his wife informed him that Petitioner was going to go live with his brother. (*Id*. at 202.) After that happened, Drummond Sr. saw a change in Drummond. Not long after, Drummond told his father that they were no longer family and that the gang was his family; they then drifted apart. (*Id.* at 202-03.) By then, communication had also broken down between Drummond Sr. and his wife, who had a rocky relationship. They later divorced, after 24 years of marriage, but continued to live together. Drummond Sr. acknowledged that this was hard on their children. (*Id.* at 203-04.) Drummond Sr. conceded on cross-examination that he would do anything to save his son. (*Id*. at 210.)

Habeas counsel also called trial counsel James Gentile.[22] Gentile conceded that Drummond's gang involvement and the explanation of why one would join a gang was a big part of the mitigation strategy and part of his opening statement to the jury. (*Id.* at 64, 68.) Gentile

---

[21] Defense counsel, however, testified credibly that Drummond Sr. was "very active in the case" and that counsel "knew [Drummond Sr.] very well throughout the case," and "probably interviewed him many, many times." (*Id.* at 80.)

[22] Habeas counsel sought and obtained leave to question Gentile as on cross-examination. (*Id.* at 53.)

testified that, in his opinion, it was defense investigator, Thomas Hrdy, rather than Dr. Fabian, who was responsible for fact-gathering for the defense team. Gentile also stated that Hrdy was not only responsible for fact gathering, but was ultimately responsible to ensure that the defense conducted a thorough investigation into Drummond's social history. (*Id.* at 75-77.)

Gentile testified that he knew about Drummond leaving home to live with Brooks. (*Id.* at 84.) Gentile knew Brooks was incarcerated at the time of Drummond's trial. The defense team discussed Brooks at length but ultimately determined he was not an important witness. (*Id.* at 82-83.) If he were important, Gentile asserted, "I don't care if he was in California, we would have interviewed him." (*Id.* at 83.) On cross-examination, Gentile explained his decision in this fashion:

Q:    Is there a reason why you didn't believe Mr. Brooks wasn't important in this case?

A:    I was concerned  -- I was concerned with perhaps the cross-examination of him and the information that would get to the jury through cross-examining Michael.

Q:    Such as the fact that he was in prison for selling drugs?

A:    Yes.

Q:    And that he had been involved in crime?

A:    Especially John spent so much [time] there that I just didn't feel comfortable with that.

Q:    So is it fair to state that it was a strategic decision not to use Brooks based on the negative impact he could have on the jury?

A:    Right or wrong, that was the decision.

(*Id*. at 122-23.)

Habeas counsel queried how Gentile came to learn of Dr. Fabian. Gentile responded that Mr. Heimbaugh of the Forensic Center suggested that counsel use Dr. Fabian. (*Id.* at 92, 95.) On cross-examination, Gentile testified that he decided to utilize Dr. Fabian because he both had a law school degree and had published in the field of death penalty mitigation. Gentile also thought Dr. Fabian would be beneficial to the defense because he had worked with gang members in juvenile court in Cleveland. (*Id.* at 106-07.) Gentile spoke with Dr. Fabian directly regarding his expertise on gangs, and Dr. Fabian told Gentile that he could testify about gangs generally and make the nexus between an individual's dissatisfaction with his or her personal life and the subsequent decision to join a gang. (*Id.* at 114.)

Gentile testified that neither Hrdy nor Dr. Fabian ever relayed that they needed more time to prepare for mitigation. (*Id.* at 125.) Gentile was unaware that Dr. Fabian had contacted the Office of the Ohio Public Defender ("OPD") to allegedly express his concerns regarding whether he had sufficient time to prepare for the mitigation hearing. Gentile stated that neither Dr. Fabian nor the OPD contacted him after the alleged conversation. (*Id.* at 129-30.) On the contrary, Gentile testified that Dr. Fabian never expressed any concerns regarding the case; in particular, he never told Gentile that he was having any trouble getting information from family members. Gentile stated that expressions of such concerns would have been "red flags," but that he had no recollection of any such concerns in this case. (*Id*. at 132-33.)

Habeas counsel also called Dr. Fabian, who testified that, after feeling time-pressured, he called the OPD for advice. When the OPD responded that Dr. Fabian should tell counsel he needed more time, Dr. Fabian stated that he relayed this information to counsel. (*Id.* at 140.) He testified that Gentile responded: "Those people down there in Columbus worry too much, they're appellate lawyers, they worry too much. Don't worry about it." (*Id.* at 141.) Dr.

81

Fabian asserted that he expressed his concerns regarding insufficient preparation three or four times to defense counsel. (*Id.* at 164.)

Dr. Fabian indicated that he had evaluated juvenile defendants for competency or disposition who had previously affiliated with gangs. (*Id.* at 144.) He stated that, aside from this experience, he had no degree or formal training about gangs, that he was not a gang expert, and that he had informed counsel of this fact. (*Id.*)

Dr. Fabian testified that, during the investigation, he and Hrdy "had difficulties understanding [Drummond]." (*Id.*, at 148.) They saw a gap in time when Drummond was between 14 and 16 years of age where "he went from kind of living with the family to eventually having problems with gangs and being shot at." (*Id.*) He said Drummond's parents "didn't seem to have a lot of insight where things went wrong." (*Id.*) Dr. Fabian stated that he first discovered information regarding Brooks on the day of his trial testimony. (*Id.* at 149, 159.) However, such assertion was discredited upon cross-examination, when Respondent's counsel requested that Dr. Fabian read his mitigation report, which stated:

> [Drummond] reported that there were some criminal offenses in the family. His brother was placed in federal prison for possession of cocaine for a ten-year period and his uncle was in prison for murder.

(*Id.* at 171.) Thus, Dr. Fabian was clearly apprised of this information in advance of his trial testimony. At a later point in his testimony at the hearing before this Court, Dr. Fabian became confused about his testimony from earlier that day:

> A:   No, I think it was around the time of trial, or it was even after he was convicted.  We did not investigate Michael Brooks, and I've testified to that.
>
> Q:   You don't know when the information about Michael Brooks, when you learned about the information about him?

A:     I don't remember right now.  I told you before - -

Q:     You don't remember receiving some information about Michael Brooks?

A:     I remember seeing an affidavit, okay. I remember learning a lot about it after he was convicted.

Q:     The affidavit was the post-conviction affidavit; is that what you're referring to?

A:     Yes, yes.

Q:     Do you recall your conversation with the parents that you discussed Brooks?

A:     Did I just say that?

Q:     You stated earlier that you had discussed Brooks with his parents?

A:     Did I say that?

Q:     Is that true?

A:     I don't know.

        THE COURT: He's asking you.

        THE WITNESS: I don't know if I - - I don't recall.

BY MR. LOVETT:
Q:     You don't recall whether you stated that today?

A:     Yeah. I actually don't. You can read it back to me.

Q:     Did you ask the parents about - - you learned from the parents that he had a half brother named Brooks, Michael Brooks; is that true? Do you recall from your memory if that is true, Dr. Fabian?

A:     I don't know whether I - - I don't know when I learned about Michael Brooks.

(*Id.* at 176-77.)

Trial counsel Yarwood also testified at this Court's evidentiary hearing. He did not recall either Dr. Fabian or Hrdy requesting more time to prepare for trial. (*Id.* at 186-87.) Yarwood stated that he was impressed with Dr. Fabian. He recalled that there had been some discussion regarding procuring a gang expert but that, once counsel procured Dr. Fabian, the defense no longer needed a gang expert. (*Id.* at 187-88.)

On the second day of the evidentiary hearing, habeas counsel called Thomas Hrdy to testify. Hrdy recalled that there was some talk of procuring a gang expert from Case Western Reserve University but that, at the last minute, the expert was unable to come to court. (*Id.* at 224.) Hrdy did not recall having any discussions regarding the need to request a continuance of the mitigation hearing. (*Id.* at 226.) Although Hrdy had not received all the records he had requested prior to trial (which, he indicated, is not unusual in these cases), he stated that, by the time trial commenced, his investigation was complete. (*Id.* at 228, 224, 229.) According to Hrdy's personal notes, he became aware of Brooks during the course of the investigation. (*Id.* at 245, 248.)

Following the testimony of these witnesses, both sides rested, concluding the hearing.[23]

### 3.    Applicable Law

The Supreme Court has expounded on the *Strickland* standard relative to claims that trial counsel failed to investigate and present mitigating evidence regarding a defendant's background. *Wiggins v. Smith*, 539 U.S. 510 (2003). In *Wiggins*, the Court held that counsel's failure to investigate and present mitigating evidence to the jury was unreasonable. Specifically,

---

[23] At the conclusion of the hearing, counsel agreed to the admission of all Respondent's exhibits and Petitioner's exhibits 1, 3a, 3b, 4a, 4b, 4c, 6, 7a, 7b, 8, 9, and 11. Petitioner's exhibits 2 and 5 were admitted with the reservation of Respondent's right to argue an exhaustion defense. The Court conditionally admitted Petitioner's exhibit 10, reserving the right to exclude it if the Court found it to be irrelevant. (*See* ECF Nos. 92-95.)

the Court held that trial counsel's failure to discover evidence of the petitioner's difficult childhood, after learning that the petitioner's mother was an alcoholic and petitioner was placed in several foster homes, was a Sixth Amendment violation.

The Court in *Wiggins* cautioned, however, that "a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." *Id.* at 527. While *Strickland* established that strategic decisions can be virtually unchallengeable, the Court in *Wiggins* emphasized that these decisions are not immune from attack if they are founded upon an unreasonable investigation. *Id.* Finding that the information the petitioner's trial counsel already reviewed triggered a duty to investigate the petitioner's background further, the Court in *Wiggins* held that trial counsel's actions were objectively unreasonable under *Strickland*.

To discern whether a petitioner was prejudiced by counsel's actions, a habeas court must determine "whether there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Rompilla v. Beard*, 545 U.S. 374, 390 (2005) (internal quotation marks and citations omitted).

The Supreme Court has recently opined further on the *Strickland/Wiggins* standard in the penalty phase of a capital trial. *Bobby v. Van Hook*, – U.S. –, 130 S. Ct. 13 (2009). Regarding counsel's duty to investigate, the Court in *Van Hook* held that counsel is not required to interview every possible witness to be constitutionally effective. Although the Sixth Circuit found that information counsel discovered should have prompted a need to interview additional relatives, the Supreme Court rejected this premise. It held: "[T]here comes a point at which evidence from more distant relatives can reasonably be expected to be only cumulative, and the search for it distractive from more important duties." *Id.* at 19.

Similarly, the Supreme Court held in *Wong v. Belmontes*, – U.S. –, 130 S. Ct. 383 (2009), that the Ninth Circuit erred when it found that defense counsel was constitutionally ineffective during the penalty phase of a capital trial. There, counsel decided against presenting some mitigating evidence of Belmontes's character because, under California law, it may have opened the door for the prosecution to introduce damaging evidence that he had committed a previous murder. In reviewing the Ninth Circuit's decision, the  Court in *Belmontes* looked at all the evidence that both the defense and the prosecution could have introduced had counsel chosen a different mitigation strategy. *Id.* at 390-91. The Court concluded that, given the circumstances, any deficiencies in counsel's performance were not prejudicial to the outcome of Belmontes's penalty phase proceeding. *Id.*

Conversely, in *Porter v. McCollum*, – U.S. –, 130 S. Ct. 447 (2009), the Supreme Court reversed the Eleventh Circuit's decision to deny a writ of habeas corpus where counsel failed to investigate and present evidence of Porter's military service in two Korean war battles, as well as evidence of a troubled childhood and brain dysfunction. Because counsel made no attempts to uncover this information even though it was obtainable, the Supreme Court held that the state court had unreasonably concluded that Porter had failed to meet his burden of proving ineffective assistance. *Id.* at 454-56.

The Sixth Circuit also has weighed in on ineffective assistance of counsel during mitigation. In *Clinkscale v. Carter*, 375 F.3d 430 (6th Cir. 2004), the court explained that the State could not simply assert that Clinkscale's counsel, who had failed to file a timely notice of alibi, had done so as part of a trial strategy. Instead, the court held that, "even if Clinkscale's attorneys subjectively believed that failing to file an alibi notice on time was in some way strategic--which is doubtful--such a 'strategy' cannot, under the circumstances presented in this

86

case, be considered objectively 'sound' or 'reasonable.'" *Id.* at 443 (citing *Roe v. Flores-Ortega*, 528 U.S. 470, 481 (2000)) (footnote and further citations omitted). The Sixth Circuit has explained that whether or not counsel's strategic decisions deserve deference is "directly proportional to the adequacy of the investigations supporting such judgments." *Jells v. Mitchell*, 538 F.3d 478, 492 (6th Cir. 2008) (citing *Wiggins*, 539 U.S. at 521).

### 4.    Legal Analysis

### a.    Sub-claims 1, 2, and 7: Improper/Incomplete Investigation and Preparation

In these sub-claims Drummond asserts that trial counsel Gentile and Yarwood were ineffective for failing to hire a "gang expert," for failing to prepare Dr. Fabian for testimony, and for failing to conduct a complete and timely investigation. The Court groups them together here as each relates to Dr. Fabian's mitigation testimony.

During the evidentiary hearing before this Court, both parties questioned defense counsel regarding their reasons for not hiring a "gang expert." In short, Gentile and Yarwood testified that, based upon Dr. Fabian's representations regarding his credentials and experience, they believed he could testify about crucial mitigating factors as effectively as any "gang expert." Dr. Fabian's testimony, however, directly contradicted defense counsel's. He stated during the evidentiary hearing, "I told them I was not a gang expert. I could testify to my involvement in gangs in my evaluations but, you know, to my knowledge or recollection, I prefaced that by saying I don't have a Ph.D. in criminology or sociology relevant to gangs in the United States." (ECF No. 96, Hr'g Tr., at 144.) Dr. Fabian and defense counsel also had diametrically opposing views regarding the adequacy of time Dr. Fabian had to prepare for his trial testimony. As noted above, Dr. Fabian insisted that he told counsel three or four times that he had concerns regarding the time he had to prepare for trial. Neither defense counsel, however,

testified that Dr. Fabian expressed his concerns to them; in fact, they both testified affirmatively that he did not express such concerns. (*Id*. at 125, 191.)

After observing the demeanor of the witnesses, and reviewing the evidence presented, the Court finds the testimony of trial counsel credible, and finds the testimony of Dr. Fabian suspect. As the Court previously noted, Dr. Fabian struggled to recall his own testimony *from earlier that day* at the evidentiary hearing, and requested that the transcript be read back to him, suggesting to the Court (and the Court so finds) that he was not being completely truthful in his testimony. Dr. Fabian was not credible when he testified regarding his recollection about what he told Drummond's trial counsel seven years prior regarding his ability to testify about gangs. Instead, the Court finds it quite believable that (as trial counsel indicated) Dr. Fabian would have convincingly represented to Drummond's trial counsel--given his credentials and experience--that he was qualified to present the necessary expert testimony regarding gangs and Drummond's involvement with gangs. Moreover, despite the fact that the Court had a separation of witnesses order in effect during the hearing, defense counsel were both consistent and credible in testifying that Dr. Fabian never expressed concerns about having sufficient time to prepare for his testimony. It is inconceivable that neither of Drummond's trial counsel would recall Dr. Fabian making a request for more time to prepare had such a request been made (which the Court finds it had not), particularly because Gentile stated during the evidentiary hearing that, had Dr. Fabian articulated such a concern, he "wouldn't have gotten [sic] in [the courtroom] if he needed more time. Nobody would have forced me to go in there.  I would have appealed to the judge and the judge would have granted it." (*Id.* at 125.)

In believing the testimony of defense counsel over Dr. Fabian, this Court finds that the decision of trial counsel relative to retaining Dr. Fabian to testify regarding Drummond's

involvement in gangs and in not hiring a different "gang expert" was not unreasonable. The Court also finds that trial counsel's decision relative to the investigation, preparation and presentation of mitigation testimony as it relates to Dr. Fabian's testimony was not unreasonable. Specifically, the Court finds that, prior to taking the witness stand, Dr. Fabian never relayed to counsel (or Hrdy) that he needed more time to investigate or that he was unable to testify about gang life and its effects on the individuals who join them. On the contrary, this Court finds that it was reasonable for counsel to rely on Dr. Fabian's self-described experience with gang members and to presume that Dr. Fabian had sufficient time to prepare for his trial testimony absent any credible assertions to the contrary. *See, e.g., Campbell v. Coyle*, 260 F.3d 531, 551 (6th Cir. 2001) ("an ineffective-assistance-of-counsel claim cannot survive so long as the decisions of a defendant's trial counsel were reasonable, even if mistaken") (citing *White v. McAninch*, 235 F.3d 988, 995 (6th Cir. 2000)). Here, counsel cannot be held responsible for the misrepresentations or omissions of Dr. Fabian. Accordingly, sub-claims 1, 2, and 7 are not well-taken.

**b.      Sub-claims 3 and 4: Inadequate Information About Drummond's Family Background**

In these sub-claims, Drummond argues that counsel were ineffective for failing to investigate and present evidence regarding Drummond's family background, particularly regarding his brother, Michael Brooks. He asserts that, had the jury known that Drummond's gang involvement began when he lived unsupervised by Brooks, it would have understood that Drummond did not come from an "intact" family, as Dr. Fabian testified. Rather, Drummond contends, the jury would have learned that Drummond was left to fend for himself during his early adolescent years.

Once again, the Court finds Dr. Fabian's hearing testimony suspect. Initially, Dr. Fabian testified that he first learned of Brooks's existence on the day of the trial. Later, he stated that he first learned of Brooks during the post-conviction relief proceedings. Respondent's counsel, however, elicited testimony during the hearing that Dr. Fabian actually knew about Brooks well ahead of his trial testimony because he was included in Dr. Fabian's report. Accordingly, Dr. Fabian's trial testimony cannot be attributed to any alleged failure by trial counsel to investigate.

Moreover, defense counsel stated that they knew of Brooks's existence but that, given his criminal record, as well as other considerations, they chose not to interview him or call him to testify. It is clear that counsel's decision not to interview or call Brooks to testify was a strategic one. Counsel chose not to interview Brooks because his incarceration and criminal record left him vulnerable to impeachment. As the Sixth Circuit explained in *Jells*, 538 F.3d at 493, whether counsel's strategic decisions deserve deference is directly proportional to the adequacy of the investigation that supported those decisions. Thus, this Court must determine the sufficiency of counsel's mitigation investigation.

Defense counsel's investigation was constitutionally sufficient. As Gentile stated during the hearing, he interviewed several family members including Drummond's parents and his sister, who was the next oldest sibling after Brooks. As the Court in *Van Hook* held, "there comes a point at which evidence from more distant relatives can reasonably be expected to be only cumulative, and the search for it distractive from more important duties." *Van Hook*, 130 S. Ct. at 19.

Although Brooks was not a distant relative, his criminal record and incarceration made him difficult to interview and an unlikely mitigation witness. It therefore was not

90

unreasonable for counsel to forego interviewing him when, as Gentile stated at the hearing, the family members they interviewed were "cooperative" (ECF No. 96, Hr'g Tr., at 122), and Brooks reasonably could be expected to provide information cumulative of other family members, yielding little benefit for their efforts and distracting them from "more important duties." Because Drummond cannot establish counsel were ineffective for failing to interview and present evidence regarding Brooks and his relationship with Drummond, these sub-claims are not well-taken.[24]

### c.      Sub-claims 5 and 6: Inadequate Information about Drummond

In these sub-claims, Drummond asserts that counsel were ineffective for failing to present evidence regarding his leg amputation and for failing to present evidence regarding Drummond as a parent and to object to the prosecution's statement about his parental financial responsibilities.  Neither claim is well-taken.

Drummond's assertion that counsel did not present evidence that Drummond's leg was amputated is belied by a review of the trial testimony. As the Ohio Supreme Court found on direct appeal, Dr. Fabian testified that when Drummond was 16, he was shot, and his leg was amputated. *Drummond,* 111 Ohio St. 3d at 49. Thus, this sub-claim is factually inaccurate.

The Court addresses the factual underpinnings of sub-claim 6 in a similar sub-claim contained in Drummond's tenth ground for relief discussed below, therein finding it to be without merit. Thus, Drummond cannot prevail on an ineffective assistance claim here because he cannot demonstrate that the prosecutor's alleged improper comments prejudiced the outcome

---

[24] While the Court permitted Drummond's habeas counsel to call Drummond Sr. and Brooks to testify at the hearing, the Court finds that the information provided by their testimony did nothing to advance Drummond's Eighth Ground for Relief. In fact, after observing these witnesses and considering their testimony, the Court finds that Drummond's trial counsel did not perform deficiently as it pertains to these witnesses and the information they had to offer.

of the penalty phase of trial. *See United States v. Hynes*, 467 F.3d 951, 970 (6th Cir. 2006) ("[w]e need not decide whether defense counsel performed deficiently if disposing of an ineffective-assistance claim on the ground of lack of sufficient prejudice would be easier") (citing *Strickland v. Washington*, 466 U.S. at 697).

### 5.    Conclusion

Because this Court believes the testimony of defense counsel and Hrdy over that of Dr. Fabian, it finds that counsel's investigation and presentation during the penalty phase of trial was constitutionally sufficient. Sub-claims 1, 2, 3, 4, and 7 of Drummond's eighth ground for relief are not well-taken. Sub-claims 5 and 6 fail for reasons of factual inaccuracies and inability to demonstrate prejudice, respectively.

## I.    Ninth Ground for Relief -- Ineffective Assistance of Counsel - Direct Appeal

Drummond contends that his appellate counsel were ineffective for failing to raise several issues on his direct appeal. Specifically, he contends that counsel should have raised the following issues: (1) defense counsel's failure to object to prosecutorial misconduct that occurred when the prosecutor vouched for the credibility of a witness, to the trial court's improper humor, and to the State's prejudicial comments regarding Drummond's remorse; (2) trial court errors that occurred when the trial court used inappropriate humor, improperly vouched for a State witness with improper humor, failed to sustain defense counsel's objection to a State witness's identification of a courtroom spectator, failed to sustain defense counsel's objection to the State's use of improper evidence of remorse, failed to grant defense motions and objections, and considered lack of remorse as an aggravating circumstance; (3) prosecutorial misconduct that occurred when the prosecutor disparaged Drummond in his opening statement, used victim-impact evidence during trial, referred to Drummond's lack of remorse, asked a State witness to

identify a courtroom spectator, bolstered the credibility of a State witness, elicited hearsay testimony, disparaged defense counsel for objecting during the State's rebuttal closing argument, argued facts not in evidence, and failed to provide the Ohio Supreme Court with specific cites to the record to substantiate claims of prosecutorial misconduct; and (4) the cumulative effect of the issues Drummond raised on direct appeal.

A defendant is entitled to effective assistance of counsel in his first appeal as a matter of right. *Evitts v. Lucey*, 469 U.S. 387, 396 (1985). The two-part test enunciated in *Strickland*, discussed above, is also applicable to claims of ineffective assistance of appellate counsel. *Smith v. Robbins*, 528 U.S. 259, 285 (2000). Thus, Drummond must demonstrate that his appellate counsel's performance was deficient, and that the deficient performance so prejudiced him that the appellate proceedings were unfair and the result unreliable. *Strickland*, 466 U.S. at 687.

Respondent claims that one of Drummond's sub-claims is procedurally defaulted because Drummond failed to raise it in his application to reopen the direct appeal. Specifically, Respondent notes that Drummond did not assert that his appellate counsel was ineffective for not arguing that the trial court committed constitutional error when it allegedly considered lack of remorse as an aggravating circumstance. (ECF No. 49, at 91.) Because Drummond failed to raise this claim at any juncture in his state court proceedings, this claim is unexhausted. Drummond cannot return to state court and raise it now. Thus, that sub-claim is procedurally defaulted and this Court will not address it on the merits.[25]

---

[25] Although Drummond asserts in the Traverse that he did raise this claim in state court, the citation to the habeas record to which he directs the Court does not support this assertion. (ECF No. 57, at 131.)

This Court also need not address the remaining sub-claims because the factual underpinnings of each sub-claim were raised in other grounds for relief in the Amended Petition. Thus, the Court has reviewed and rejected the underlying bases for Drummond's ineffective assistance of appellate counsel claims elsewhere in this Opinion. Because the Court finds no merit to Drummond's sixth, seventh, tenth, and twelfth grounds for relief, Drummond's assertion that counsel were ineffective for failing to raise these issues on direct appeal also is without merit because he cannot show the prejudice he must show to succeed on an ineffective assistance of appellate counsel claim. *See Hynes*, 467 F.3d at 970 ("Because [petitioner's] claim can be readily resolved on the prejudice prong, we will therefore forego analysis of the deficient-performance prong."). Accordingly, Drummond's ninth ground for relief is not well-taken.

**J.      Tenth Ground for Relief -- Misconduct of Prosecutor**

Drummond maintains that prosecutorial comments rendered his trial fundamentally unfair. He asserts that he should be granted relief because the prosecutor:

1.      Called Drummond a coward;

2.      Used leading questions to develop witness testimony;

3.      Commented that defense counsel "rudely interrupted" by objecting during the State's closing argument;

4.      Used the words "some guys" rather than the word "guy" when referring to testimony regarding a statement Rozenblad overheard Drummond make;

5.      Made remarks regarding Drummond's lack of remorse;

6.      Commented on a fact that was not in evidence;

7.      Elicited victim-impact evidence from Dent Sr.;

8.      Improperly vouched for a State witness;

9.      Elicited hearsay testimony and introduced prejudicial photographs; and,

94

10.     Caused Sergeant Lambert to identify a courtroom spectator.

To assert a successful prosecutorial misconduct claim in a habeas proceeding it "is not enough that the prosecutors' remarks were undesirable or even universally condemned. The relevant question is whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)); *Durr v. Mitchell*, 487 F.3d 423, 439 (6th Cir. 2007). This question must be answered in light of the totality of the circumstances in the case. *See Lundy v. Campbell*, 888 F.2d 467, 474-5 (6th Cir. 1989). The prosecutor's comments must be so egregious as to render the trial fundamentally unfair. *See Simpson*, 238 F.3d at 409.

In assessing a prosecutorial misconduct claim, a habeas court first determines whether the prosecutor's comments were improper. *Raedeke v. Trombley*, No. 08-1407, 2009 WL 751096, at *6 (6th Cir. Mar. 23, 2009) (quoting *Boyle v. Million*, 201 F.3d 711, 717 (6th Cir. 2000)). Once the court finds improprieties, it must then determine whether the conduct was "flagrant," requiring reversal. *See id.* at * 6-7 (citations omitted). The Sixth Circuit uses "a four-factor test to analyze the flagrancy of alleged instances of prosecutorial misconduct: (1) whether the prosecutor's statements tended to mislead the jury or prejudice the accused; (2) whether the misconduct was isolated or extensive; (3) whether the misconduct was deliberate; and (4) the total strength of the evidence against the accused." *Id.* at *6 (quoting *Donnelly*, 416 U.S. at 643). Guided by this standard, the Court turns to Drummond's individual sub-claims for relief.

1. **Sub-claims 1, 9, and 10**

In the Traverse, Drummond withdrew the above sub-claims, conceding that they did not warrant habeas relief. This Court therefore will not review them.

2. **Sub-claim 2: Prosecutor's Use of Leading Questions**

Drummond maintains that the prosecution improperly asked its own witnesses numerous leading questions. He raised this issue on direct appeal to the Ohio Supreme Court, but that court observed that Drummond did not provide "examples of misconduct or record references showing when the misconduct occurred" for any of the prosecutorial misconduct claims he asserted. *Drummond*, 111 Ohio St. 3d at 45. Additionally, Drummond's counsel failed to object to the leading questions. Accordingly, this sub-claim should be procedurally defaulted under Ohio's plain error rule.[26] While the Ohio Supreme Court addressed the merits of the claim, it did so only to determine whether the prosecution had committed plain error. *Id.* This Court therefore must presume that the Ohio Supreme Court did not excuse Drummond's failure to contemporaneously object to the leading questions. Accordingly, the Court finds this sub-claim to be procedurally defaulted.

This sub-claim lacks merit in any event. In its opinion denying Drummond relief, the Ohio Supreme Court held that none of the questions that were leading resulted in plain error. A review of the citations to the record that Drummond cites reveals that the prosecution used leading questions merely to assist in the expeditious development of a witness's testimony. For example, the Ohio Supreme Court reasoned that the prosecution's use of leading questions

---

[26] Ohio courts have determined that a failure to contemporaneously object to an alleged error constitutes procedural default. *See State v. Williams*, 51 Ohio St. 2d 112, 117 (1977), *overturned on other grounds, Williams v. Ohio*, 438 U.S. 911 (1978). If a defendant fails to object to a trial error that would affect a substantial right, then the appellate courts will conduct a plain error analysis of that claim. *State v. Slagle*, 65 Ohio St. 3d 597, 604 (1992). The Sixth Circuit consistently has held that an Ohio appellate court's review for plain error does not constitute a waiver of its contemporaneous objection rule. *E.g., Keith v. Mitchell*, 455 F.3d 662, 673-74 (6th Cir. 2006) (citations omitted).

regarding the date Morris entered the Mahoning County Jail was for purposes of "orient[ing] the witness to the time and moved the trial forward without unnecessary delay." *Id.* at 35. This Court finds that there is nothing unreasonable in the Ohio Supreme Court's decision as it has, upon review of the record, come to the identical conclusion.

### 3. Sub-claim 3: Prosecutor's Remarks During Closing Argument

Drummond asserts that the prosecutor improperly told the jury that "we were so rudely interrupted" after defense counsel objected during the State's closing argument. This sub-claim was not raised with specificity on direct appeal to the Ohio Supreme Court and is therefore procedurally defaulted.

Even if ripe for habeas review, this Court would not find this sub-claim to be well-taken. While the comment regarding defense counsel's objection may not have been a model for prosecutorial behavior, it hardly "infected the trial with unfairness [so] as to make the resulting conviction a denial of due process." *Darden*, 477 U.S. at 181 (internal quotation omitted). Because it was an isolated comment that did not mislead the jury about pertinent information, this sub-claim lacks merit. *See, e.g., Durr*, 487 F.3d at 442 (isolated remark did not rise to level of prosecutorial misconduct).

### 4. Sub-claim 4: Prosecutor's Use of Plural Form of Word

Drummond maintains that the prosecutor mischaracterized Rozenblad's testimony by stating that he heard Drummond talking at a party and stating "some guys," rather than one "guy" had moved from the South Side into Drummond's neighborhood. (ECF No. 35, Trial Tr., Vol. 13, at 2897.) Drummond did not raise this sub-claim with specificity on direct appeal to the Ohio Supreme Court and that court did not address it on the merits. Thus, the sub-claim is procedurally defaulted.

97

This sub-claim also lacks merit. The prosecutor apparently misspoke on that occasion. Because of the infrequency of the remark as well as its relative insignificance, this Court finds this sub-claim is without merit.

5.      **Sub-claim 5: Prosecutor's Remark Regarding Lack of Remorse**

Drummond objects to the prosecutor's references to his lack of remorse. During the testimony of Chauncey Walker, the prosecutor asked Walker if Drummond had ever expressed remorse over the death of Dent Jr. Walker responded, "He probably [sic] sorry that he in the situation that he in. I don't know about being sorry about somebody getting hurt in this situation." (*Id.*, Vol. 15, at 3198.) The prosecutor also commented during penalty phase closing arguments that Drummond expressed "no remorse" over the baby's death. (*Id.*, Vol. 18, at 3909.) As with the above sub-claims, Drummond did not raise this sub-claim with specificity on direct appeal to the Ohio Supreme Court and that court did not address it on the merits. Thus, the sub-claim is procedurally defaulted.

In any event, neither of these remarks constitutes prosecutorial misconduct. Walker's response to the prosecutor's question clearly indicated that he did not know whether Drummond felt remorse about Dent Jr.'s death. The prosecutor's remark during closing argument, when placed in context, also was not improper. During Drummond's unsworn statement, he apologized to the Dent family for their loss but denied killing Dent Jr. During the State's rebuttal closing argument, the prosecutor suggested that by denying responsibility for Dent Jr.'s death, Drummond did not truly demonstrate remorse for it. Neither of these statements appear to be improper, let alone flagrant. Even under the flagrancy test, when taken in context of the entire trial record, both statements are insignificant and, because they were isolated, did not mislead the jury. This sub-claim lacks merit.

98

6. **Sub-claim 6: Comment on Fact Not in Evidence**

Drummond argues that because the prosecutor stated during closing arguments that Drummond did not pay child support for his children, a fact not proven during the trial, that he is entitled to habeas relief. Drummond did not support this allegation when he raised it to the Ohio Supreme Court and that court therefore did not address it on the merits. Thus, this sub-claim is procedurally defaulted.

Nonetheless, this sub-claim also lacks merit. While it is true that the prosecutor's comment during closing argument that the mother of Drummond's children, "had to get an order for child support," because Drummond, "doesn't pay," was an improper comment because no evidence adduced during trial established that allegation (*Id.*, Vol. 18, at 3893-94), the trial court clearly explained to the jury that this was not evidence it could consider in its deliberations. *Id.* at 3921 ("[A]rguments of counsel are designed to assist you, but they are not evidence."). Thus, the jury presumably did not consider whether Drummond paid child support in its penalty phase deliberations. Moreover, the comment was an isolated one and, given the totality of evidence presented during the penalty phase of trial, the comment does not undermine the Court's confidence in the outcome of that proceeding.

7. **Sub-claim 7: Victim-impact Evidence**

In this sub-claim Drummond maintains that the State introduced victim-impact evidence when the prosecutor asked Dent Sr. whether it was difficult being put on hold by the 911 operator after calling to obtain assistance for Dent Jr. Because Drummond did not raise this sub-claim with specificity on direct appeal to the Ohio Supreme Court, it is procedurally defaulted.

99

The sub-claim lacks merit in any event. During this colloquy, the prosecutor asked Dent Sr. about the 911 call immediately after it was played for the jury. He queried, "911 had you on hold for quite some time. How difficult was that?" Dent Sr. responded, "Very difficult. It was taking too long." (*Id.*, Vol. 12, at 2527.) Drummond incorrectly contends that this exchange constituted victim-impact evidence. Dent Sr. was a witness to the events that occurred and the prosecutor was merely inquiring about the events of the shooting as Dent Sr. observed them. The fact that the prosecutor asked one question regarding how Dent Sr. felt at the moment he made the call does not render the comment improper. *See Ohio v. DuBose*, No. 00-C-A-60, 2002 WL 1376248, at * 12 (Ohio Ct. App. June 6, 2002) (Remarks concerning "suffering[, specifically relating to how a victim felt when he was calling 911], related to the offense and do not appear to fit the statutory conception of victim-impact testimony.") Even if it were an improper question, it is clearly not flagrant because the prosecutor asked no other questions regarding Dent Sr.'s emotions during the remainder of his testimony. As such, it was an isolated comment.

### 8.   Sub-claim 8: Vouching for State Witness

In Drummond's final prosecutorial misconduct sub-claim, he asserts that the State vouched for one of its witnesses. During the testimony of Detective Sergeant Pat Kelly of the Youngstown Police Department, the prosecutor queried whether Kelly could have solved the case without the assistance of Chauncey Walker. Kelly responded, "No." (*Id*., Vol. 12, at 3260.) Drummond claims this statement constitutes the State's improper vouching for one of its witnesses. As with the above claims, Drummond did not raise this sub-claim with specificity on direct appeal and the Ohio Supreme Court did not address it. Thus, it is procedurally defaulted.

100

Even if ripe for habeas review, this sub-claim would not be well-taken. The Sixth

Circuit held in *United States v. Trujillo*, 376 F.3d 593 (6th Cir. 2004), that:

> "Improper vouching occurs when a prosecutor supports the credibility of a
> witness by indicating a personal belief in the witness's credibility thereby placing
> the prestige of the office of the United States Attorney behind that witness.
> [I]mproper vouching involves either blunt comments or comments that imply that
> the prosecutor has special knowledge of facts not in front of the jury...."

*Id.* at 607-08 (quoting *United States v. Martinez*, 253 F.3d 251, 253-54 (6th Cir. 2001); further

citations omitted; alterations in original). Here, the prosecutor did not personally bolster the

credibility of Walker's testimony. Rather, he inquired whether Kelly believed Walker's

testimony was valuable. The prosecutor therefore did not improperly vouch for a State witness.

**K.      Eleventh Ground for Relief -- Proportionality**

Drummond contends that the Ohio Supreme Court did not conduct an adequate

proportionality review of his case. Specifically, Drummond claims that the Ohio courts

improperly excluded cases in their review in which the State sought the death penalty but did not

obtain it. Drummond raised this claim on direct appeal and the Ohio Supreme Court addressed it

on the merits. It is therefore preserved for federal habeas review.

A proportionality review is not constitutionally required. *Pulley v. Harris*, 465

U.S. 37, 50-51 (1984)*; see also McQueen v. Scroggy*, 99 F.3d 1302, 1333–34 (6th Cir. 1996)

("There is no federal constitutional requirement that a state appellate court conduct a

comparative proportionality review."), *overruled on other grounds by*, *In re Abdur'Rahman,* 392

F.3d 174 (6th Cir. 2004). By statute, however, Ohio requires the appellate courts to engage in a

proportionality review. Ohio Revised Code § 2929.05(A) states:

> In determining whether the sentence of death is appropriate the court of appeals,
> in a case in which a sentence of death was imposed for an offense committed
> before January 1, 1995, and the Supreme Court shall consider whether the

sentence is excessive or disproportionate to the penalty imposed in similar cases. They shall also review all the facts and other evidence to determine if the evidence supports the finding of the aggravating circumstances the trial jury or the panel of three judges found the offender guilty of committing, and shall determine whether the sentencing court properly weighed the aggravating circumstances the offender was found guilty of committing and the mitigating factors.

Ohio Rev. Code § 2929.05(A).

Because Ohio law requires appellate courts to engage in a proportionality review, the review must be consistent with constitutional requirements. *Kordenbrock v. Scroggy*, 680 F. Supp. 867, 899 (E.D. Ky. 1988) (citing *Evitts v. Lucey*, 469 U.S. 387 (1985)), *rev'd on other grounds*, 919 F.2d 1091 (6th Cir. 1990). Nonetheless, when the state courts have engaged in a proportionality review, the federal habeas court's review is limited. The habeas court is to examine the state's proportionality review only to determine whether the imposition of death on the petitioner is patently unjust or "shocks the conscience." The court is not to second-guess the state court's comparison of other cases in which the death penalty was imposed." *Id.* (citing *Moore v. Balkcom*, 716 F.2d 1511, 1517 (11th Cir. 1983)); *see also Spinkellink v. Wainwright*, 578 F.2d 582, 604 (5th Cir. 1978) (same).

In *Spinkellink*, the petitioner argued

that his crime, when compared to other Florida death penalty cases, was insufficiently gruesome or heinous to warrant the death penalty and had highlighted seven other cases in which the Florida Supreme Court had reversed death sentences. All of these other cases allegedly involved defendants equally or more deserving of the death penalty than he.

*Moore*, 716 F.2d at 1517–18 (citing *Spinkellink*, 578 F.2d at 602, 604). The court in *Spinkellink* "condemned a federal case by case analysis of the cases used by the state appellate court in its proportionality review as an unnecessary intrusion on the Florida [state] judicial system." *Moore*,

716 F.2d at 1518 (citing *Spinkellink*, 578 F.2d at 604). As the Eleventh Circuit held in reversing

a district court's case-by-case proportionality review of the Georgia Supreme Court:

> A federal habeas court should not undertake a review of the state supreme court's proportionality review and, in effect, 'get out the record' to see if the state court's findings of fact, their conclusions based on a review of similar cases, was supported by the 'evidence' in the similar cases. To do so would thrust the federal judiciary into the substantive policy making area of the state.

*Moore,* 716 F.2d at 1518. Moreover, when examining an Ohio capital conviction on habeas

review, the Sixth Circuit has stated that, because "proportionality review is not required by the

Constitution, states have great latitude in defining the pool of cases used for comparison." *Buell*,

274 F.3d at 369.

The Ohio Supreme Court's review of Drummond's sentence comports with

constitutional requirements. It held:

> Finally, we find that the death penalty is proportionate to death sentences approved for other child murders under R.C. 2929.04(A)(9). *State v. Fitzpatrick*, 102 Ohio St.3d 321, 2004-Ohio-3167, 810 N.E.2d 927, ¶ 119 (12-year-old victim); *State v. Lynch*, 98 Ohio St.3d 514, 2003-Ohio-2284, 787 N.E.2d 1185, ¶ 196 (six-year-old victim); *State v. Smith*, 97 Ohio St.3d 367, 2002-Ohio-6659, 780 N.E.2d 221, ¶ 79 (six-month-old victim). Furthermore, the death penalty is proportionate to death sentences approved for other course-of-conduct murders. *State v. Foust*, 105 Ohio St.3d 137, 2004-Ohio-7006, 823 N.E.2d 836, ¶ 203; *State v. Gapen*, 104 Ohio St.3d 358, 2004-Ohio-6548, 819 N.E.2d 1047, ¶ 182; *State v. Mink*, 101 Ohio St.3d 350, 2004-Ohio-1580, 805 N.E.2d 1064, ¶ 130.

*Drummond*, 111 Ohio St. 3d at 51.

This proportionality review does not "shock the conscience." The Ohio Supreme

Court compared Drummond's case with cases in which the defendant killed a child and with

other course-of-conduct murders. This Court can provide no further review.

**L.        Twelfth Ground for Relief -- Cumulative Error**

Drummond asserts that the cumulative effect of the errors from his state court proceedings entitles him to habeas relief. Drummond raised this claim for the first time in his *Murnahan* appeal, and thus it was raised under a different theory (ineffective assistance of appellate counsel for failing to raise a cumulative error claim) than he raises it here. It is therefore procedurally defaulted. *See Lorraine v. Coyle*, 291 F.3d 416, 425 (6th Cir. 2002).

Regardless of its defaulted status, this claim lacks merit. The Sixth Circuit acknowledged in *Williams v. Anderson*, 460 F.3d 789 (6th Cir. 2006), that "the law of this Circuit is that cumulative error claims are not cognizable on habeas because the Supreme Court has not spoken on this issue." *Id.* at 816 (citing *Moore v. Parker*, 425 F.3d 250, 256 (6th Cir.2005)); *see also Gillard v. Mitchell*, 445 F.3d 883, 898 (6th Cir. 2006) (holding that while errors might accumulate to produce unfair trial setting, the Supreme Court has never held distinct claims can accumulate to grant habeas relief) (citations omitted); *Lorraine,* 291 F.3d at 447, *amended on other grounds*, 307 F.3d 459 (6th Cir. 2002) (same). Accordingly, this claim lacks merit.

**M.        Thirteenth Ground for Relief -- Constitutional Challenge**

Drummond's final ground for relief is aimed at the structure of Ohio's capital punishment scheme. He asserts Ohio's capital punishment scheme is unconstitutional on its face. The Court addresses each sub-claim, but is not persuaded by any of Drummond's allegations. In summary fashion, and regardless of their defaulted status, the Court lists below these allegations, in italics, and thereafter states the reasons they are unpersuasive.

- *The Eighth Amendment explicitly prohibits the infliction of cruel and unusual punishment upon a convicted criminal offender.* (ECF No. 45, at ¶¶ 267-271). This argument was rejected in *Gregg v. Georgia*, 428 U.S. 153 (1976) (holding

death penalty *per se* not constitutionally barred).

- *Prosecutors have unregulated discretion in determining who will be charged with the death penalty.* (*Id.* at ¶ 272(A); ¶ 273.) Again, the Supreme Court in *Gregg v. Georgia*, 428 U.S. 153 (1976), rejected this argument under a similar death penalty statute, condoning the discretionary system.

- *The statutory scheme fails to require premeditation or deliberation.* (*Id.* at ¶ 272(B); ¶ 275.) This argument is groundless as, under Ohio Revised Code § 2903.01, "aggravated murder" requires causing the death of another "purposely, and with prior calculation and design[.]" Moreover, the Supreme Court sanctioned the use of a criminal state of mind less culpable than intent, *i.e.*, reckless indifference, as an acceptable level of culpability to impose the death penalty. *See Tison v. Arizona*, 481 U.S. 137, 157 (1987) (affirming death sentence of capital defendant, who took part in prison escape but was not present when murder of kidnapped family occurred, because he possessed a "reckless disregard for human life.").

- *The statutory scheme fails to establish a standard for determining the existence of mitigating factors.* (*Id.* at ¶ 272(C).) The Supreme Court requires "that the record on appeal disclose to the reviewing court the considerations which motivated the death sentence in every case in which it is imposed." *Gardner v. Florida*, 430 U.S. 349, 361 (1977). Ohio Revised Code § 2929.03(F), accordingly, requires that a trial judge make a written finding as to the existence of specific mitigating factors and aggravating circumstances, and why the aggravating circumstances outweigh the mitigating factors. By making a record of these determinations, the appellate court is able to make an "independent determination of sentence appropriateness[.]" *State v. Buell*, 22 Ohio St. 3d 124, 137, *cert. denied*, 479 U.S. 871 (1986). Thus, no constitutional infirmity exists.

- *The statutory scheme fails to establish a standard by which to balance the mitigating factors against the aggravating circumstances.* (*Id.* at ¶ 272(D).) The Supreme Court has determined that a state is not required to give the jury guidance as to its weighing and consideration of the evidence adduced during the mitigation phase. *See Buchanan v. Angelone*, 522 U.S. 269, 275-77 (1998). Thus, this claim fails.

- *The statutory scheme permits the trier of fact to consider aggravating circumstances in the trial phase.* (*Id.* at ¶ 272(E); ¶¶ 277-280.) In *Zant v. Stephens*, 462 U.S. 862 (1983), the Court concluded that any death penalty statute must narrow the class of death-eligible defendants from those not death eligible. *Id.* at 877. In *Lowenfield v. Phelps*, 484 U.S. 231, 244-45 (1988), the Supreme Court found:

> The use of "aggravating circumstances" is not an end in itself, but a means of genuinely narrowing the class of death-eligible persons and thereby channeling the jury's discretion. We see no reason why this narrowing function may not be performed by jury findings at either the sentencing phase of the trial or the guilt phase.

Therefore, Ohio's requirement that aggravating circumstances be proven during the guilt phase rather than the penalty phase is consistent with *Lowenfield*.

- *The statutory scheme does not give the sentencer the option to impose a life sentence when the sentencer determines that the aggravating circumstances outweigh the mitigating factors beyond a reasonable doubt.* (*Id.* at ¶ 272(F).) The Supreme Court rejected a similar argument in *Blystone v. Pennsylvania*, 494 U.S. 299, 306-08 (1990). In accordance with *Blystone*, Drummond's claim cannot be examined here.

- *The statutory scheme encourages capitally charged individuals to plead guilty. Crim. R. 11 (C)(3).* (*Id.* at ¶ 272(G).) *The Ohio scheme is also unconstitutional because it imposes an impermissible risk of death on capital defendants who choose to exercise their right to a jury trial.* (*Id.* at ¶¶ 281, 282.)  In *United States v. Jackson*, 390 U.S. 570, 582 (1968), the Supreme Court determined that a legislative body cannot produce a chilling effect on a defendant's Fifth Amendment right not to plead guilty and Sixth Amendment right to demand a jury trial. In that case, the Court struck down the capital portions of a federal kidnapping statute because it authorized only the jury to impose the death sentence. *Id.* at 585. Conversely, in Ohio "a sentence of death is possible whether a defendant pleads to the offense or is found guilty after a trial." *Buell*, 22 Ohio St. 3d at 138 (citing Crim.R.11(C)(3)). Consequently, the Ohio scheme comports with constitutional mandates.

- *The statutory scheme creates a mandatory death penalty.* (*Id.* at ¶ 272(H); ¶ 273.) The Court presumes that this argument is essentially the identical argument presented above (that the jury must impose a death sentence when it finds the aggravating circumstances outweigh the mitigating factors). The Court need not re-address that argument here. Without further explanation as to the nature of this claim, the Court cannot address it further.

- *The statutory scheme permits the State to argue first and last in mitigation.* (*Id.* at ¶ 272(I).) Even if this sequence does place a capital defendant at a disadvantage, and the Court does not so find, this fact does not implicate a constitutional violation. As long as a statute requires the prosecution to prove the existence of all aggravating circumstances, the defendant's constitutional rights are not violated. *Walton v. Arizona*, 497 U.S. 639, 649-51 (1990). This aspect of the *Walton* holding is unaltered by the Supreme Court decision *Ring v. Arizona*, 536

U.S. 584 (2002).

- *The statutory scheme permits the death penalty to be applied in an arbitrary, capricious and discriminatory manner.* (*Id.* at ¶¶ 272(J); 285.) *The statutory scheme also violates due process.* (*Id.* at ¶¶ 283, 284.) Other than bald assertion, Drummond cites no specifics about the Ohio statutory scheme that substantiate his arguments. Drummond also does not explain how the Ohio courts' application of the death penalty statutes runs afoul of Supreme Court jurisprudence. Accordingly, this claim must fail.

- *The statutory scheme mandates that the findings of an examination pursuant to R.C. § 2929.03(D)(1) must be furnished to the trial court, the trier of fact, and the prosecutor and any information learned about the accused would be used against him at trial.* (*Id.* at ¶ 272(K).) Although the Fifth Amendment would be violated if a court orders a defendant to undergo a psychiatric examination, without informing the defendant that his statements can be used against him, and then admits his statements into evidence during the sentencing phase in order to prove statutory aggravating circumstances, *see Estelle v. Smith*, 451 U.S. 454 (1981), the Fifth Amendment will not be violated if the defendant requests the psychiatric evaluation himself. This reasoning is explained in *Buchanan v. Kentucky*, 483 U.S. 402 (1987):

  > A criminal defendant, who neither initiates a psychiatric evaluation nor attempts to introduce any psychiatric evidence, may not be compelled to respond to a psychiatrist if his statements can be used against him at a capital sentencing proceeding. This statement logically leads to another proposition: if a defendant requests such an evaluation or presents psychiatric evidence [of such an evaluation], then, at the very least, the prosecution may rebut this presentation with evidence from the reports of the examination that the defendant requested. The defendant would have no Fifth Amendment privilege against the introduction of this psychiatric testimony by the prosecution.

  *Id.* at 422 (internal quotations omitted; citations omitted). As such, this claim fails.

- *The Ohio scheme has resulted in the imposition of death penalties in a racially discriminatory manner, with blacks and those who killed white victims being much more likely to get the death penalty.* (*Id.* at ¶ 274.) Drummond alleges that those who are racial minorities or who kill whites are more likely to receive the death penalty. Pursuant to *McClesky v. Kemp*, 481 U.S. 279 (1987), a capital defendant cannot evade a death sentence merely by demonstrating the statistical disparity of capital defendants or victims of a particular race. Instead, the capital defendant must prove that the decision maker in his or her individual case acted

107

with a discriminatory purpose, and that such actions had a discriminatory effect on the proceeding. *Id.* at 292. As Drummond has not asserted that discrimination occurred during his sentencing, this claim must fail.

- *The statutes do not require the State to prove the absence of any mitigating factors and that death is the only appropriate penalty.* (*Id.* at ¶ 276.) This argument was specifically rejected in *Walton v. Arizona*, 497 U.S. 639, 649–50 (1990) and, therefore, fails. There the Supreme Court held a death penalty scheme requiring the defendant to establish mitigating factors by a preponderance of evidence is constitutionally acceptable burden-shifting. This aspect of the *Walton* holding is unaltered by the Court's decision *Ring v. Arizona*, 536 U.S. 584 (2002).

## VII.    Certificate of Appealability Analysis

The Court now must determine whether to grant a Certificate of Appealability ("COA") for any of Drummond's claims. The Sixth Circuit Court of Appeals has determined that neither a blanket grant nor a blanket denial of a COA is an appropriate means by which to conclude a capital habeas case as it "undermine[s] the gate keeping function of certificates of appealability, which ideally should separate the constitutional claims that merit the close attention of counsel and this court from those claims that have little or no viability." *Porterfield v. Bell*, 258 F.3d 484, 487 (6th Cir. 2001); *see also Murphy v. Ohio*, 263 F.3d 466, 467 (6th Cir. 2001) (remanding motion for certificate of appealability for district court's analysis of claims). Thus, in concluding this Opinion, the Court now must consider whether to grant a COA as to any of the claims Drummond presented in his Petition pursuant to 28 U.S.C. § 2253.

That statute states in relevant part:

(c)(1) Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from –
    (A) the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court [. . .];

  (2) A certificate of appealability may issue under paragraph (1) only if the applicant has made a substantial showing of the denial of a constitutional right.

28 U.S.C. § 2253. This language is identical to the requirements set forth in the pre-AEDPA statutes, requiring the habeas petitioner to obtain a Certificate of Probable Cause. The sole difference between the pre- and post-AEDPA statutes is that the petitioner must now demonstrate he was denied a *constitutional* right, rather than the federal right that was required prior to AEDPA's enactment.

The Supreme Court interpreted the significance of the revision between the pre- and post-AEDPA versions of that statute in *Slack v. McDaniel*, 529 U.S. 473 (2000). In that case, the Court held that § 2253 was a codification of the standard it set forth in *Barefoot v. Estelle*, 463 U.S. 880 (1983), but for the substitution of the word "constitutional" for "federal" in the statute. *Slack,* 527 U.S. at 483. Thus, the Court determined

> "[t]o obtain a COA under § 2253(c), a habeas prisoner must make a substantial showing of the denial of a constitutional right, a demonstration that, under *Barefoot*, includes showing that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were "'adequate to deserve encouragement to proceed further.'"

*Id*. at 483–84 (quoting *Barefoot*, 463 U.S. at 893 n.4).

The Court went on to distinguish the analysis a habeas court must perform depending upon its finding concerning the defaulted status of the claim. If the claim is not procedurally defaulted, then a habeas court need only determine whether reasonable jurists would find the district court's decision "debatable or wrong." *Id.* at 484. A more complicated analysis is required, however, when assessing whether to grant a COA for a claim the district court has determined is procedurally defaulted. In those instances, the Court opined, a COA should only issue if "jurists of reason would find it debatable whether the petition states a valid

claim of the denial of a constitutional right *and* that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Id.* (emphasis supplied).

After taking the above standard into consideration, and for the reason indicated, the Court shall issue a COA pursuant to 28 U.S.C. § 2253(c) and Fed. R. App. P. 22(b), and shall certify that an appeal could be taken in good faith pursuant to 28 U.S.C. § 1915(a)(3), on the following ground:[27]

> **Second Ground (Confrontation Violation)--Cross-examination of Rozenblad Only:** While the Court finds that analysis of the *Van Arsdall* factors demonstrates that the trial court's error was harmless beyond a reasonable doubt, a jurist of reason could conclude that limitation of Rozenblad's cross-examination was unconstitutionally harmful to the defense.

The Court shall not issue a COA on the following grounds:

> **First Ground (Denial of Public Courtroom) - February 5 Closure:** The Court will not issue a COA concerning the February 5 partial closure because this claim is procedurally defaulted and Drummond failed to demonstrate cause and prejudice; no reasonable juror could conclude otherwise.

> **Second Ground (Confrontation Violation) - Cross-Examination of Morris and Thomas:** In light of the fact that Morris's charges were already dismissed and the charges against Thomas were stale and going to be dropped because of their age, no reasonable jurist would conclude that the trial court's limitation was unreasonable.

> **Third Ground (Trial Violated Due Process):** Drummond withdrew the claims in this ground for relief in the Traverse.

> **Fourth Ground (Improper Juror Dismissal Rulings):** This claim is procedurally defaulted, and no reasonable jurist would issue a COA for this claim.

> **Fifth Ground (Actual Innocence - Sufficiency of the Evidence):** Drummond's actual innocence claim was cursory and unsupported by any new evidence. The State presented ample evidence for a rational factfinder to convict Drummond. Reasonable jurists would not debate this finding.

---

[27] Since the Court has granted the petition as to the portion of the First Ground which deals with denial of a public courtroom on February 4, 2004, there is no need to issue a COA with respect to that issue. *See* 28 U.S.C. 2253 (c). The Court, however, presumes that this will not forestall any appeal of this issue by the Respondent.

**Sixth Ground (Manifest Judicial Bias):** This claim is procedurally defaulted, and no reasonable jurist would issue a COA for this claim.

**Seventh Ground (Culpability Phase Ineffective Assistance of Counsel):** Drummond withdrew sub-claims 1-6, 7(a), 7(b), 7(e), and 8-9 in the Traverse. No COA will issue for sub-claims 7(c) and (d) because no reasonable jurist would find that counsel's failure to request that all sidebar conferences be recorded, or trial counsel's failure to object to the trial court's alleged inappropriate behavior and the prosecutor's alleged misconduct, was prejudicial to Drummond.

**Eighth Ground (Penalty Phase Ineffective Assistance Counsel):** The Court will not issue a COA as to Drummond's sub-claim 1, relating to the failure to hire a gang expert. After hearing evidence and observing the demeanor of the witnesses, the Court is convinced that Drummond's trial counsel were not ineffective in failing to hire a gang expert because Dr. Fabian assured them that he was qualified and capable of testifying on the issue of gangs. Further, the Court finds Dr. Fabian's testimony that he told trial counsel that he did not have adequate time to prepare incredible. The Court will not issue a COA with respect to sub-claims 2-4 and 7, concerning trial counsel's failure to investigate Drummond's family and background and to timely complete the mitigation investigation. The Court finds, after hearing evidence and observing the demeanor of the witnesses, that reasonable jurists would conclude that counsel acted reasonably when they determined not to interview Brooks and in making the strategic decision not to call Brooks to testify at trial. No reasonable jurist would issue a COA concerning sub-claims 5 and 6, relating to whether trial counsel was ineffective for failing to present evidence of Drummond's leg amputation and his parental status, and for failing to object to the prosecutor's closing argument, because Drummond failed to demonstrate prejudice.

**Ninth Ground (Ineffective Assistance of Counsel - Direct Appeal):** The portion of this ground challenging appellate counsel's failure to raise the trial court's alleged consideration of lack of remorse as an aggravating circumstance is procedurally defaulted. Additionally, with respect to all remaining sub-claims, no reasonable jurist would conclude that appellate counsel's failure to raise certain issues on direct appeal was prejudicial. As the Court concluded above, counsel's alleged failures do not undermine the Court's confidence in the outcome of Drummond's trial or appeal.

**Tenth Ground (Misconduct of Prosecutor):** Drummond withdrew sub-claims 1, 9, and 10 in the Traverse. The remaining sub-claims are procedurally defaulted. No reasonable jurist would issue a COA for these sub-claims.

**Eleventh Ground (Proportionality):** This claim occurs almost pro forma in capital habeas petitions but is routinely denied. Reasonable jurists would agree with this finding.

**Twelfth Ground (Cumulative Error):** This claim occurs almost pro forma in capital habeas petitions but is routinely denied. Reasonable jurists would agree with this finding.

 **Thirteenth Ground (Constitutional Challenge):** This claim occurs almost pro forma in capital habeas petitions but is routinely denied. Reasonable jurists would agree with this finding.


## VIII.   Conclusion

The Court finds, with respect to the grounds raised by Drummond in his amended petition for writ of habeas corpus, that all but one part of Ground One are not well-taken -- on the merits, or because of procedural default, or both.

The Court finds meritorious that portion of Ground One that asserts a denial of Drummond's Sixth Amendment right to a public trial because of the partial closure of his trial on February 4, 2004 and, on that basis, the amended petition for writ of habeas corpus in **GRANTED IN PART**.

Accordingly, the Court issues a writ of habeas corpus as follows: The Respondent shall either (1) set aside Drummond's convictions for aggravated murder of Jiyen Dent, Jr. and the sentence of death attendant thereto; or (2) conduct another trial. The Respondent shall retry Drummond, or set aside the convictions and sentence for aggravated murder within 180 days from the effective date of this Order.

On this Court's own motion, execution of this Order and, hence, its effective date, is stayed pending appeal by the parties.

**IT IS SO ORDERED**.

Dated: December 31, 2010

**HONORABLE SARA LIOI**
**UNITED STATES DISTRICT JUDGE**